BERTHA TOENEBOEHN v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—298 S. W. 795.

Division One, September 16, 1927.

1. **NEGLIGENCE: Speed of Train: Country Crossings.** There is no statute regulating the speed of railroad trains at country crossings, and usually, at common law, it is not negligence for a passenger train to run at a rapid speed over railroad crossings in the country, between stations, away from congested populations; but whether the speed, even at country crossings, is negligent, depends upon all the surrounding circumstances; and where the track was in a deep cut, and the visibility of the train was obscured by a high intervening embankment, and the public road crossed the tracks at an acute angle which required the traveler when he got within a few feet of the track to turn sideways to look for approaching trains, and the community was populous and five or six hundred vehicles passed daily over the crossing where the motor truck was struck, the question whether a speed of thirty-five to forty miles an hour was negligent is one for the jury.

2. ————: **Flagman, Watchman or Other Warning: Country Crossing.** There is no statute requiring a railroad to maintain a flagman, watchman, alarm bell or other warning device at a country crossing, but there may be circumstances under which warnings of approaching trains other than those required by statute should be given; and whether or not it was negligence to fail to maintain them, was, under the circumstances of this case, a question submissible to the jury, along with all the other facts in evidence, in order that they might determine whether the railroad company was guilty of negligence at the time its rapidly running passenger train struck a traveler in a motor truck at a much-traveled public crossing in an obscured cut.

3. ————: **Whistle and Bell: Negative Testimony.** The statute requires the whistle of a train to be sounded at least eighty rods from a railroad crossing and to be sounded at intervals until the engine has passed the crossing, and if the signal is by ringing the engine bell it must be kept ringing until the engine has passed the crossing; and whether the whistle was sounded or the bell kept ringing in the manner required by the statute is a negative fact, and may be proved by negative testimony; and in view of the testimony in this case, the question was one for the jury, notwithstanding the testimony of defendant's fireman that the whistle was continuously sounded and the bell kept ringing, for the plaintiff is entitled to have the testimony in her favor taken as true and to all reasonable inferences to be drawn therefrom, and the inference that the jury could draw from the evidence in this case was that the whistle was not sounded within 700 feet of the crossing and that the bell was not kept ringing.

4. ————: **Contributory: Motor Vehicle: Highest Degree of Care: Trial Theory.** Where the case was not tried upon the statutory theory that the deceased driver of the motor truck, in approaching a railroad crossing, was required to exercise the highest degree of care (Laws 1921, Ex. Sess., p. 91, sec. 19), but upon the theory that he was bound to exercise ordinary care for his own safety, the defendant, having framed the issue and tried the case upon the theory of ordinary care, cannot on appeal have the question

of the deceased's contributory negligence considered on the theory that he was chargeable with the highest degree of care.

5. ———: ———: As Matter of Law: Prima-Facie Case: Statutory Signals: Presumption. Where plaintiff's evidence tends to show that the statutory signals were not given as the passenger train approached the railroad crossing, a presumption arises that a failure to give them was the proxi-' mate cause of the injury to the deceased driver of the motor truck struck by the engine, and plaintiff is entitled to recover unless plaintiff, in making her case, showing defendant's negligence and failure to give the statutory signals, also shows that the driver was guilty of contributory negligence as a matter of law. But if plaintiff makes a prima-facie case, upon the issue whether the statutory signals were given, and it does not appear from plaintiff's evidence that the driver was guilty of contributory negligence as a matter of law, the burden then rests upon defendant to make out its affirmative defense of contributory negligence, by a preponderance of the evidence, and the case becomes one for the jury. And it will not be held that the deceased was guilty of negligence as a matter of law where the contention that had he looked he would have seen the approaching train rests upon the truthfulness of defendant's witnesses, and there is positive testimony that had he looked he could not have seen the train because of the intervening high embankment.

6. ———: Instruction: Speed of Train. An instruction submitting the speed of a passenger train at a country railroad crossing as a negligent act is not erroneous, where the question whether the speed was negligent depends upon the conditions surrounding the crossing, namely, an acute angle between the railroad and the public highway upon which the motor truck was traveling, a deep cut for the track, a high intervening embankment which obstructed the view, a much-traveled highway, and no flagman, watchman, alarm bell or other warning device at the crossing.

7. ———: ———: Warning: Bell or Whistle. The statute does not require that warning of the approach of a train be given by both whistle and bell, but an instruction which requires the jury to find that defendant "negligently failed to give timely warning by bell or whistle," though otherwise awkwardly expressed, does not require the giving of both.

8. ———: ———: Flagman at Country Crossing: Ordinary Care: No Standard. An instruction which, after hypothesizing negligence upon a failure to sound the whistle or to keep the bell ringing and upon the speed of the train, tells the jury that "if you find and believe from the evidence that the surrounding circumstances and conditions rendered said railroad crossing unusually dangerous and hazardous, and that under the circumstances and conditions then existing, railroad management in the exercise of ordinary care required a flagman or watchman or alarm bell or some other device to be placed at said crossing to warn persons crossing said railroad of the approach of trains, and that defendant failed to use such precaution as you may find from the evidence ordinary care required; and that in so doing, if you so find, any or all the aforesaid acts or things caused" the traveler in the motor truck "to be injured and killed, without any negligence on his part contributing thereto," etc., is not erroneous, as permitting the jury, without any evidence to guide them, to set up their own standard as to what "railroad management in the exercise of ordinary care" required with respect to placing a watchman, flagman or other warning device at the crossing, nor as constituting a roving commission to the jury to find that the defendant "failed to use such precaution" as they might find from the evidence ordinary care might require; but in its ultimate effect the instruction submitted the question whether, under the actual circumstances, defendant exercised reasonable care, and whether its neglect to use ordinary care caused the injury, and was not erroneous.

9. **NEGLIGENCE: Instruction: Motor Truck: Highest Degree of Care.**
Where the answer of defendant in pleading contributory negligence did not charge that the deceased driver of the motor truck failed to use the highest degree of care, but only with failure to exercise ordinary care, and defendant asked and was given instructions stating that it was its duty to exercise ordinary care, defendant cannot complain of an instruction for plaintiff telling the jury that the driver was not guilty of contributory negligence if he exercised ordinary care.

10. ———: ———: **Contributory Negligence: Failure to Look or Listen.**
An instruction telling the jury contributory negligence on the part of the deceased driver of the motor truck, struck by a train at a country crossing, must be shown by a preponderance of the evidence, is not erroneous on the theory that, under all the evidence, for the driver to look was to see, and to listen was to hear, and that under the circumstances the presumption arose that he did not look or listen, or if he did he did not heed what he saw or heard, where the evidence is conflicting on the point whether the whistle was sounded or the bell kept ringing, and he could not have seen until he was within four to ten feet of the track, or until the train was almost upon him, and then only by shifting himself about in his seat.

11. ———: ———: **Penalty or Damages.** An instruction which uses neither the word "penalty," nor the word "damages," is not erroneous, because it does not expressly direct the jury to assess a penalty against defendant in the event they find for plaintiff in the action for the negligent killing of her husband, nor must it be considered as requiring the jury to consider the plaintiff's pecuniary loss as damages.

---

Corpus Juris-Cyc. References: **Appeal and Error**, 4 C. J., Section 2609, p. 701, n. 49; Section 2719, p. 773, n. 2. **Death**, 17 C. J., Section 183, p. 1314, n. 75. **Railroads**, 33 Cyc., p. 943, n. 62; p. 944, n. 65; p. 960, n. 53; p. 972, n. 33; p. 974, n. 39; p. 989, n. 21; p. 1069, n. 92, 93, 94; p. 1071, n. 5, 8; p. 1102, n. 23, 24; p. 1104, n. 32; p. 1108, n. 59; p. 1119, n. 1; p. 1133, n. 1; p. 1137, n. 23. **Trial**, 38 Cyc., p. 1518, n. 69; p. 1543, n. 68.

Appeal from Circuit Court of St. Louis County.—*Hon. J. W. McElhinney,* Judge.

AFFIRMED.

*E. T. Miller, A. P. Stewart* and *A. E. L. Gardner* for appellant.

(1) The demurrer to the evidence should have been sustained, and the peremptory instruction requested by defendant at the close of the whole case should have been given. Deceased's contributory negligence bars recovery. (a) The law imposes on deceased, in the operation of his motor vehicle on a public highway, the duty to exercise the highest degree of care to protect himself against injury. Laws 1921 (1st Ex. Sess.) p. 91, sec. 19; Monroe v. Railroad, 297 Mo. 633; Threadgill v. Railways, 279 Mo. 466; Jackson v. Tel. Co., 281 Mo. 358; Freie v. Railway (Mo. App.), 241 S. W. 674. (b) If the view was obstructed, it was deceased's duty, in the exercise of even ordinary care, to have stopped his automobile while in a place of safety, so that he might have ascertained whether a train was near at

hand before driving into the danger zone. Monroe v. Railroad, 297 Mo. 654. (c) It was the duty of deceased to look or listen at the first opportunity after passing the obstruction. The evidence discloses a situation where to look was to see, and to listen was to hear; hence it will be presumed either that he did not look or listen, or that he did not heed what he saw or heard. In any view of the evidence deceased's contributory negligence conclusively appears, and there can be no recovery as for primary negligence on the part of defendant. Monroe v. Railroad, 297 Mo. 654; State ex rel. v. Bland, 237 S. W. 1018; Burge v. Railroad, 244 Mo. 96; Kelsay v. Railroad, 129 Mo. 372; Hayden v. Railroad, 124 Mo. 572; Porter v. Railway, 199 Mo. 82; Huggart v. Railway, 134 Mo. 679; Sanguinette v. Railway, 196 Mo. 466; Evans v. Railway, 289 Mo. 493; Alexander v. Railway, 289 Mo. 599; Langley v. Hines, 207 Mo. App. 587; Freie v. Railway, 241 S. W. 674; Lyter v. Hines, 224 S. W. 843; Stillman v. Railway, 266 S. W. 1008; Bradley v. Railroad, 288 Fed. 487; Tannehill v. Ry. Co., 279 Mo. 165. (2) Instruction 2 given for plaintiff is erroneous and prejudicial, and the giving of same constituted reversible error. (a) There was no evidence authorizing the submission to the jury of the question whether the speed of the train was unreasonable or negligent, nor from which the jury could find that it was unreasonable or negligent. McGee v. Railroad, 214 Mo. 530. It is reversible error to give instructions which are not supported by the evidence. Evans v. Railway, 106 Mo. 594; Paddock v. Somes, 102 Mo. 239; Marr v. Bunker, 92 Mo. App. 661; Chambers v. Railway, 111 Mo. App. 612. (b) This instruction authorized a finding for plaintiff if defendant failed to give either of the statutory signals by bell or whistle. The instruction as framed required the giving of both, whereas the statute is complied with by giving one or the other. Turner v. Railway, 78 Mo. 580; Cathcart v. Railway, 19 Mo. App. 119; Halferty v. Railway, 82 Mo. 97; Braddy v. Railroad, 47 Mo. App. 522. (c) This instruction permitted the jury, without any evidence to guide them, to set up their own standard as to what "railroad management, in the exercise of ordinary care," required with respect to placing a watchman, flagman or alarm bell or device at the crossing. Chrismer v. Tel. Co., 194 Mo. 189; Harrelson v. Railroad, 151 Mo. 482. (d) This instruction further constituted a roving commission to the jury to find that defendant "failed to use such precaution as they might find from the evidence ordinary care required." Instructions should be based on both the pleadings and the evidence. Black v. Railway, 217 Mo. 685; State ex rel. v. Ellison, 270 Mo. 645. (3) Instruction 4, given for plaintiff, is erroneous, in that it informed the jury that deceased was not guilty of contributory negligence if they found that he exercised ordinary case. The measure of care required of him by the law was the highest degree of

care; and failing to exercise that degree of care, he was guilty of contributory negligence. Authorities supra. (4) Instruction 5 given for plaintiff is erroneous, misleading and prejudicial. Under all the evidence, to look was to see, and to listen was to hear. Under such circumstances, the presumption arises that deceased did not look or listen, or, if he did, that he did not heed what he saw or heard. In either case he was guilty of contributory negligence. Kelsay v. Railway, 129 Mo. 374; Porter v. Railway, 199 Mo. 98; Sanguinette v. Railway, 196 Mo. 495; Stillman v. Railway, 266 S. W. 1009. (5) Plaintiff's given Instruction 6, on the amount of recovery, is erroneous and not supported by the evidence. It does not direct the jury to assess a penalty against defendant, in the event they found for plaintiff, but proceeds on the theory of damages. It authorizes the jury, in determining the amount of their award, to consider pecuniary loss, as well as the life expectancy of deceased, without any evidence whatever upon which to base an estimate. Treadway v. Railways, 300 Mo. 156; Grier v. Railway, 286 Mo. 523; Lackey v. Railways, 288 Mo. 120.

*Wilson & Trueblood* for respondent.

(1) The demurrer to the evidence was properly overruled, because: the question of deceased's contributory negligence was for the jury. It could not be said as a matter of law that deceased was guilty of contributory negligence. Shaeffer v. Railroad Co., 254 S. W. 257; Hoff v. Wabash Ry. Co., 254 S. W. 874; Norton v. Davis (Mo. App.), 265 S. W. 107. (2) Plaintiff's Instruction 2 was proper because: (a) There was evidence of common-law negligence with reference to the speed of the train. Montague v. Railroad, 264 S. W. 813; Holden v. Railway, 177 Mo. 456; Shaeffer v. Ry. Co., 254 S. W. 257. (b) The instruction did not require giving a warning by both bell and whistle, but simply required that the statutory warning be given either "by bell or whistle." Sec. 9943, R. S. 1909; Hoff v. Wabash Ry. Co., 254 S. W. 874. (c) The instruction did not permit the jury to set up their own standard with reference to guarding the railroad crossing or give the jury a roving commission, but required the jury to find from the evidence that the surrounding circumstances and conditions were such that the crossing was rendered unusually dangerous and hazardous and that ordinary care upon the part of those charged with the management of the railway required that a watchman or warning device be placed at the crossing, and the instruction properly limited the jury to the precautions shown by the evidence to be necessary. Welsch v. Ry. Co., 72 Mo. 451; Weller v. Ry. Co., 23 S. W. 1061, 16 Am. Law Rep. 1273. (3) Plaintiff's Instruction 4 was not erroneous because defendant's answer pleaded that deceased was guilty of contributory negligence by

a failure to exercise "ordinary care," and the defendant instructed on that theory. Defendant did not plead or ask instructions upon the theory that the deceased was required to exercise the highest degree of care for his own safety. Defendant is bound by the theory upon which it tried the case below. Kenefick v. Insurance Co., 205 Mo. 294, 103 S. W. 957; Gordon v. Park, 219 Mo. 600, 117 S. W. 1163. (4) Plaintiff's Instruction 5 was proper because it was to be presumed that the deceased was in the exercise of care commensurate with the circumstances. It rested upon the defendant to prove contributory negligence on the part of the deceased. Norton v. Davis, 265 S. W. 107; Weller v. Ry. Co., 164 Mo. 180; Friese v. Ry. Co., 241 S. W. 671; Hickman v. E. L. & P. Co., 226 S. W. 570. (5) Plaintiff's Instruction 6 properly instructed upon the measure of damages. Greer v. Railway, 286 Mo. 523; Treadway v. United Rys. Co., 253 S. W. 1037; Lackey v. United Rys. Co., 288 Mo. 120; Sec. 4217, R. S. 1919; McDaniel v. Davis, 266 S. W. 710.

LINDSAY, C.—This cause is now being considered upon the rehearing, granted by this court. The plaintiff is the widow of Charles J. Toeneboehn, deceased, who was killed on July 16, 1922, when an automobile truck driven by him was struck by the engine of one of defendant's passenger trains, at the crossing of defendant's track and Vermont Avenue, a public highway in St. Louis County, not far distant from the limits of the city of St. Louis. The plaintiff had a verdict and judgment for $8,400.

Vermont Avenue runs north and south, and the deceased was driving northward. Defendant's track approaches and crosses Vermont Avenue from southeast to northwest, and the train was running from southeast to northwest. The track approaches the crossing at an acute angle. The inner angle of the intersection of Vermont Avenue and defendant's track is only a little more than twenty-eight degrees. The crossing is in a cut, and in approaching it from the south, on Vermont Avenue, there is a descending grade; and defendant's track approaches from the southeast upon a descending grade. There is an embankment along the southwest side of defendant's track on the east side of Vermont Avenue, and near the crossing; and, at the time of the occurrence, there was a growth of grass and weeds upon the embankment, and there was a mile-post sign on the southwest side. A more particular description of the physical surroundings will be given later.

Vermont Avenue extends northward from the village of Afton, or from Gravois Road, in St. Louis County, to an intersection with a road known as Heege Road, at a point four or five hundred feet north of this crossing. Afton is upon the line of defendant's road, that being the name of the postoffice, but the station at that place is known

as Gravois Station. It is a little more than a mile south, or slightly southeast, from the crossing in question.

The petition alleged that what was known as Gravois Road, running into the city of St. Louis, was part of a state highway; and that, at and prior to the time in question, Gravois Road was under construction, and vehicular traffic into and out of the city detoured upon Vermont Avenue and Heege Street. The community was populous, and there was testimony that 500 or 600 vehicles passed daily over the Vermont Avenue crossing.

The petition charged negligence in seven particulars, but in the plaintiff's instruction submitting the case and authorizing a recovery, three acts of negligence were specified: (1) operating the train at a greater rate of speed than was reasonable, having regard to the time, place and circumstances, and the conditions existing at the crossing; (2) failure to give the statutory signal by bell or whistle, and (3) failure to keep and maintain a watchman, flagman, alarm bell or other warning device at said crossing. The evidence shows that the train in question was a through passenger train running from Memphis to St. Louis, and was thirty-five or forty minutes late, and was running at a speed of thirty-five or forty miles an hour; that defendant did not maintain a watchman, flagman, alarm bell or other warning device at said crossing. The evidence as to the giving of the statutory warning signal by bell, or whistle, is somewhat conflicting, but defendants had much evidence tending to show that the statutory signals were given. The answer, after a general denial, pleaded contributory negligence on the part of the deceased, in running his automobile in front of and so close to the locomotive and train that the train could not be stopped in time to avoid striking him; attempting to cross without looking or listening and when he saw, or by the exercise of ordinary care could have seen, the train in time to have avoided injury; attempting to cross without stopping to look or listen, when by so doing he could have discovered the approach of the train, and driving his automobile at an excessive, unlawful and dangerous rate of speed in approaching the track, when he knew, or by the exercise of ordinary care could have known, that a train might pass on said track at any moment. The reply was a general denial.

There was no issue in the case under the humanitarian rule. Defendant complains of the instructions given for plaintiff, but the first and paramount question arises upon the assignment that the trial court erred in refusing to give the peremptory instruction offered by the defendant at the close of plaintiff's case, and at the close of the whole case.

It is contended for defendant that there was no evidence authorizing submission to the jury of the question whether the speed of the train was unreasonable or negligent, and that plaintiff's Instruction

2 was erroneous in submitting that question. Otherwise, there is little effort to show there was no substantial evidence of primary negligence on the part of defendant; but the claim emphasized is, that deceased was guilty of contributory negligence as a matter of law. The issue made calls for a consideration of the evidence as to the circumstances under which the deceased lost his life.

Charles J. Toeneboehn lived about one mile from the crossing in question, and had ridden over it many times and was familiar with the surroundings. He was forty-eight years of age and was a contractor and builder, and upon this occasion he was on his way into the city of St. Louis, where he was engaged in building construction. He was unaccompanied, and drove a Dorris motor truck, which he had owned and driven for a number of years. The truck was described as a right-hand-drive machine. It had what was spoken of as an express top. The time was a little before eight o'clock in the forenoon. The plaintiff called no witness who saw the collision between the truck and the train. The only witnesses who claimed to see the truck immediately before it went upon the track, called by defendant, were the fireman, and another employee of defendant, who was a passenger and testified that he sat in the chair car on the southwest side of the train.

The testimony as to the physical conditions existing at and near the crossing requires attention. The plaintiff called as a witness a civil engineer, who testified that shortly before the trial he had made a survey of the crossing and its surroundings. He testified that from the crossing, southeast, the track was straight for a long distance, and he determined that the inner angle of the intersection of Vermont Avenue and the defendant's track was a little more than twenty-eight degrees. He determined the rise in the grade of Vermont Avenue, starting from the crossing and going south. He said that in the first fifty feet there was a rise of nine-tenths of a foot; in the next fifty feet a rise of two and four-tenths feet, and a rise of two and five-tenths feet from the 100-foot point, to the 150-foot point south of the intersection; that in the next fifty feet, going south, there was a rise of two feet in the grade, and in the next fifty feet, going south, a further rise of one and four-tenths feet. Thence, there is a slight continuous rise for about 450 or 500 feet. There was thus a fall of three feet and four inches in the 100 feet next to the crossing. According to his testimony, there was a hill in the acute angle of the intersection between Vermont Avenue and defendant's track. This hill or ridge is higher in the center than it is at the line of defendant's right-of-way, or at the east line of Vermont Avenue. It thus slopes downward toward the defendant's track, and toward Vermont Avenue, but, as we understand the testimony, the slope toward the railroad is more abrupt. He testified as to the height of the embank-

ment on the southwest side of defendant's track, going southeast on defendant's track from the intersection. He said: "South of the intersection the top of the embankment is six and five-tenths feet higher than the rails; at 150 feet it is about five and nine-tenths feet higher; at 200 feet it is six and five-tenths feet; at 250 feet it is six and four-tenths feet—that is, the edge of the cut just west of the tracks." He said: "The high point westwardly is between the cut and Vermont Avenue, at 150 feet; that is twelve and five-tenths feet higher. At 200 feet south it is eleven and five-tenths feet higher. At 250 feet, it is about twelve feet higher. At 300 feet, it slopes out practically the same height as it is at the edge of the cut along the railroad track on the west side of the railroad. At 300 feet, the top of the embankment is six and four-tenths feet higher than the top of the rail. At 350 feet it is six feet higher; at 400 feet it is five feet higher; at 450 feet it is two and eight-tenths feet higher; at 500 feet it runs out." He testified that the hill, or ridge, is nearer the railroad track than Vermont Avenue. As to the visibility of the railroad track to one going north on Vermont Avenue toward the intersection, he testified that from a point about 500 or 600 feet south of the railroad track, going northward on Vermont, the tracks are visible there, and said they were visible until you get within about 250 feet of the intersection. He added: "There you lose the view of it, that is, looking toward the north, the way you are travelling. If you turn and look to the south, of course you can see it through that low swale, a considerable distance south." He testified that at a point seventy-five feet south from the intersection of Vermont Avenue and the railroad track, the track was visible, looking at right angles to Vermont Avenue; that from a point seventy-five feet south of the intersection, the track at the point due east, was about forty or forty-one feet from Vermont Avenue. He further testified that a man "sitting in an automobile on Vermont Avenue at a point 100 feet south from the crossing could not see the locomotive passing by 100 or 150 feet south from the intersection, if the locomotive was opposite to him." It is impossible, to us, at least, from the examination of this witness as shown in the record, to get a definite picture of the scene sought to be portrayed. The witnesses said at a point 100 or 150 feet south of the intersection you could not see a locomotive opposite, or looking east at right angles, but that at a point on Vermont Avenue seventy-five feet south of the intersection looking eastward at right angles, the tracks are plainly visible; but, it is impossible to say from his testimony whether he meant that they continued to be visible from that point on, to the crossing, or not.

The intervening and important question here, is that of the visibility of a train to a person going north on Vermont Avenue, and approaching near this crossing. Turning to the testimony of plain-

tiff's lay witnesses, Edward Toeneboehn said: "When you travel north on Vermont Avenue there is a hill towards the right, or east of Vermont, approximately ten or twelve feet high; it is a steep hill; it is not terraced, or nothing; it is a hill that runs straight up; that continues toward the railroad track, to a point up this far; I cannot say the exact measurements; I would judge about six feet. I have driven in a machine over that railroad track many times, and have stopped there. Judge I was six feet from the railroad track when I came to a stop before I had a line of vision up the road eastwardly on the track. When you get to the track with your automobile you have to be almost entirely on the track, then you have to turn around and look at an angle. When I say six or eight feet, I mean from the point where I stood, my vision."

August Dietjen, another witness called by plaintiff on his re-direct examination, testified: "In order to get a view of the tracks to the right as you go northwardly on Vermont Avenue you would have to be up on the graded part of the railroad embankment in order to look up the track. Cannot say how many feet that is from the rail; could not state any exact measurement. By 'graded part' I mean it is cut through there wide enough to lay the tracks, and on the side of the tracks they have a ditch; you have to be in the part that they cut out in order to look up the tracks. Don't know how wide the cut is; cannot say whether you would have to be as much as thirty feet from the rails in order to look up the track; cannot say because I don't know the distance, don't know the number of feet, don't know whether it would be thirty feet or more."

Herman T. Reim testified for plaintiff: "I went by that crossing probably an hour and a half after the accident, and drove within, say, about two feet or so of the track. There was a high embankment on the right-hand side, and it was overgrown with weeds, almost up to the track, and there was a whistling post—anyway some kind of post—in the embankment to the railroad track, and there was also weeds growing between there which kind of obscured my view. I did not have a view of the track over the hill, unless it was back from the railroad track, say about 300 or 350 feet, before I got to the railroad track, going north."

S. D. Hodgdon, Probate Judge of St. Louis County, and president of the St. Louis County Automobile Club, said that he was familiar with this crossing. He testified: "I have driven northwardly on Vermont Avenue. Vermont Avenue is downgrade towards the railroad track; on the right hand, that would be going north, there is an embankment which is, I should say, about the height of an automobile, and runs south from the railroad, I should say, about 150 or 200 feet. I made a stop at the railroad track to observe a train approaching from the east or south every time I crossed it. I had to be within

317 Mo. Sup.—70.

about four and one-half feet of the outside track before a clear view
of the track is visible; the railroad and the wagon road going through
at this particular point and crossing in the cut prevents your ob-
taining a clear view until you reach that point. At that point there
is a single track, and trains operate over the track in both directions.
When you are travelling northwardly, in order to look for a train
coming from the east or southeast you would have to look backwards
partly, and then across on an angle. The wagon road crosses the
railroad on an angle.''

The testimony of the civil engineer was that the whistling post was
1390 feet southeastward from the crossing and on the east side of the
track; also, that not far distant from this post was a manure pile,
to which some of defendant's witnesses made reference in their tes-
timony, as locating the point at which they said the crossing whistle
was sounded. The manure pile was 1360 feet south of the crossing,
and fifty-seven feet east from the center of the railroad track.

Eugene Brinkop, driving south, saw the deceased a little before he
drove on the crossing, and testified: ''I passed over the Vermont
Avenue crossing of the railroad tracks at about eight o'clock in the
morning, and passed Charles Toeneboehn driving northward, on the
road. I knew him very well. I passed him at a point about 200 feet
south of the crossing.'' The witness said that he and Toeneboehn
waved to each other as they passed, but neither of them stopped
there; that Toeneboehn was driving a truck and was going very
slow; that he did not see any train before he saw Toeneboehn, and
did not hear any train; that as he passed Toeneboehn, down about
200 feet from the crossing, he (witness) continued on south, and when
he came to a point between 400 and 500 feet (from the crossing) he
heard a whistle; that he looked and saw the train; that he continued
on and then looked back; had gone probably fifty or 100 feet before he
looked back; that he saw a flash, and figured the train had hit some-
thing; did not know whether Mr. Toeneboehn had crossed the track
or not; that he wondered at the time whether or not he had crossed it;
that he could not see the train as it crossed on Vermont Avenue—
the grade of the hill prevented it. The witness said that he had gone
southwardly from the railroad crossing a distance of approximately
500 feet, on Vermont Avenue, when he first heard the train whistle.
He said: ''When I heard the train whistle, I continued on. I saw the
train at the time I looked, in an easterly direction, east and south,
perhaps a little bit south. When I first heard the train whistle it
was between 700 and 800 feet from the crossing. I measured it by
stepping it off.'' He indicated the spot to Mr. Dziatzko (the civil
engineer) and he measured it. Witness further testified: ''When
I heard the train whistle, it was, I should say, about 400 or 500 feet
north of the whistling post.'' He testified that he drove back later

on the day of the accident, on his way back to St. Louis, and observed the conditions. He said: "I approached within ten or twelve feet of the railroad track, before I could look southeasterly down the track. The track runs across there at an acute angle, and you have to look southeasterly in order to see a train approaching from the south." This witness further testified: "Before I heard the whistle 700 feet from the crossing, I did not hear any other signal from the approaching train. I did not hear any bell. I heard two whistles. I heard the first one when my attention was first directed to the train, and the fact that the train was coming. I had not seen or heard the train before that. I looked back just an instant before I saw this flash, and that is when I heard the second whistle." The testimony shows that the train ran approximately 2000 feet beyond the crossing; that the deceased and parts of the truck were on and about the pilot of the engine.

It may be proper to state now that upon the question whether defendant's peremptory instruction should have been given, the position of counsel for plaintiff is, that upon the question of the primary negligence of defendant, plaintiff made a case to go to the jury; and that, since under plaintiff's case there is no evidence to show the conduct of the deceased immediately before or upon entering the track, the presumption is to be indulged that he was in the exercise of ordinary care for his own safety, and that thereunder, the case could not be taken from the jury by virtue of the evidence introduced by defendant.

The defendant introduced several persons, members of a family living on the west side of Vermont Avenue at a distance of between 100 and 200 feet from the crossing.

Elmer Horst, fourteen years of age, testified that on the morning in question he and his brother were loading horse-radish at a point about 200 feet distant from the railroad tracks, but where they could not see the crossing; that they saw Mr. Toeneboehn drive northward upon the road, in his truck; that he was about 200 feet from the crossing; that they watched him for thirty or forty feet and turned to their work; that he was driving slow; that they noticed this train whistle, and first noticed it whistle when it was by the manure pile; that it whistled all the way down to the crossing. Elmer Horst testified that he did not hear the bell ring; did not know whether it was ringing or not. His brother, Erwin Horst, twelve years of age, who was with him at the time he saw Mr. Toeneboehn driving along when about 200 feet south of the crossing, said that he saw the train and the first thing that attracted him to the train was the whistle; that at the time it was near the manure pile and the whistling post; that it sounded like the whistle was continuous up to the time of the crash; that he did not notice whether the bell was ringing or not;

that he did not see Mr. Toeneboehn again after he saw him at a point about 250 feet south of the crossing, but heard the crash when the train struck the truck; that Mr. Toeneboehn "was driving slow" when he saw him. Both said they watched deceased drive thirty or forty feet, and then turned to their work.

Mrs. Lydia Horst, mother of the witnesses last mentioned, testified that at the time of the accident she was in the house; that she heard the train; was first attracted to it by the whistle; that it seemed like one continuous whistle to her. Further on she testified she did not hear the train coming; that she imagined she heard the crash when it got to the crossing; could not estimate the time between when she first heard the whistle, and heard the crash.

Frank Williams, the fireman, called by the defendant, testified that he was in his position on the left side of the cab of the engine; that the whistle was blown for the Vermont Avenue crossing; that the whistle —two longs and two shorts—was not only given before they got to the whistling post, but as they got to the whistling post and after they passed the whistling post; that the engine had an automatic bell ringing; that the bell was set to ringing before they reached the Gravois crossing, and was still ringing; that from the time they passed Gravois Station, until the collision, they must have given twelve or fourteen blasts of the whistle. This witness testified that he did not see the truck until just before it was struck; that when he first noticed the truck "we must have been fifty or sixty feet from him—from the crossing;" that he judged deceased was about fifteen or eighteen feet, maybe farther, from the crossing—from the track; that he noticed no stopping or slowing up of the truck or movement about slowing up; that in his judgment the truck was going probably fifteen or twenty miles an hour. This witness also said: "Before we struck the truck I called to my engineer, 'Big hole,' and he reached for his brake valve; that the truck was so close, going at the rate of speed it was going, it was impossible to stop at that distance; and the train was running thirty-five or forty miles an hour." On his cross-examination the fireman was asked as to the testimony given by him at the coroner's inquest. He was asked if the following question was asked and the following answer given by him to the coroner:

"Q. Tell this court what you know of this accident. The Witness: I was ringing the bell. It is a very steep grade there; when I first saw him, from the way the car was stopped, the front wheels were over the rail; it was done so quick that I hardly knew what happened."

"Q. Did you testify before the coroner to that effect? A. Yes, sir."

Curtis Thompson, an employee of defendant, testified that he was travelling on the train in question, going to St. Louis for treatment; that he was seated on the left-hand side of the train, and looking out to view the country; that as they came along he noticed an automobile truck to his left, going in a northerly direction, coming on at an angle to the course of the train; that he stuck his head out of the window when he "first seen the man and heard the whistle;" that he noticed the truck for a few minutes; that he saw the man; supposed the man was looking over the steering wheel; and that the automobile went out of his sight for a moment or so; that the last time he saw it, he heard the crash; that the second or last time he saw it, it was fifteen or twenty feet from the track; that it was moving northward, going toward the crossing; did not stop, but just kept going; that the next thing that happened he heard the crash.

"Q. Did you notice the driver of that car when you saw it the second time as he approached the tracks? Could you tell what he was doing? What direction he was looking? A. I did not see that. The second time, I could not say I noticed the man. I just noticed the truck as it dashed on. I noticed the truck as it seemingly dashed upon the railroad."

Further testifying, he said that the truck did not stop, or attempt to stop, or slacken its speed; that the whistle began to blow about the time he first saw this truck; that the truck was going about fifteen miles an hour; and that this was when about one-half mile from the crossing; that the "whistle blowed a number of times," and that he heard the engine bell ringing on the train. On his cross-examination he estimated the speed of the truck at fifteen miles an hour, and the speed of the train at thirty-five to forty miles an hour. He did not remember seeing any other automobile, or seeing the building—the Horst residence. The Horst brothers made no mention of seeing the automobile of witness Brinkop.

In rebuttal, the civil engineer testified that a line, drawn to the manure pile from the point where Elmer and Erwin Horst stood when they heard the whistle sounded, would intersect defendant's track at a point 870 feet south from the crossing. Plaintiff also recalled the witness Brinkop, who testified that he passed deceased about 200 feet south of the crossing, and at that time deceased was entering the cut; that the train was between 700 and 800 feet from the crossing when he first heard it whistle; that he heard no blast of the whistle before that.

The testimony of witness Reim on his cross-examination, was that the Dorris truck operated by deceased, when going ten miles an hour, could be stopped in about six feet. He said he had never driven that truck, but had ridden in it with deceased; and that going twenty miles an hour he (witness) could stop it in less than twenty feet, if

he had to, and going five miles an hour could stop it almost immediately.

As we have already indicated the chief claim of counsel for defendant is that the general peremptory instruction should have been given; and upon the ground that the deceased was guilty of contributory negligence; but, there is also the assignment raising the question whether the defendant was guilty of negligence. At the close of the case, defendant offered certain withdrawal instructions, which, if given, would have withdrawn the issues of failure to give the statutory warning, and failure to have a flagman, watchman, bell or other device at the crossing, and also the issue of negligent speed of the train.

There is no statute regulating train speed at country crossings, and it has always been held by this court that in the country, between stations, away from congested populations, it is **Speed of** not negligence for a passenger train to run at a rapid **Train.** speed over railroad crossings. [McGee v. Wabash Railroad, 214 Mo. 1. c. 541.]

The question then is one of common-law negligence. "Negligent speed at common law is dependent upon all the surrounding circumstances. [Heinzle v. Railway Co., 182 Mo. 1. c. 555; Beier v. St. Louis Transit Co., 197 Mo. 1. c. 231; Klockenbrink v. St. Louis Ry. Co., 172 Mo. 1. c. 690; Montague v. Ry. Co., 264 S. W. 813; Harrington v. Dunham, 273 Mo. 431.]" The like statement may be found in Ward v. Mo. Pac. Ry. Co., 277 S. W. 1. c. 910.

Under all the circumstances in this case we hold the question whether the speed of the train was negligent, was a question for the jury.

There is no statute, and in this case no ordinance, requiring maintenance at this crossing of a flagman, watchman, bell or other warning device. The failure to maintain a flagman or bell at **Flagman** the crossing was not negligence *per se.* There is no dis- **or Other** pute as to the fact that no flagman or warning device was **Warning.** maintained at this crossing. There may be circumstances under which warnings other than those required by statute should be given: [Burger v. Mo. Pac. Ry. Co., 112 Mo. 238.] The application of the rule is dependent upon the circumstances in the particular case. It has been frequently held that failure to keep a flagman at a crossing, may be submitted to the jury with the other evidence in the case, for the purpose of enabling them to determine whether, under all the circumstances, the railroad company was guilty of negligence at the time of the injury. [Welsch v. Hannibal Ry. Co., 72 Mo. 451. See also 16 A. L. R. (Annotation) 1273.] Speaking upon this question, it was said in Thomas v. C. R. I. & P. Ry. Co., 271 S. W. (Mo. App.) 865, that where the statute makes no such requirement, the question whether or not it is negligence to omit them

is in some cases a question of law for the court, and in others a question of fact for the jury. We think the omission here was submissible under and in connection with the other conditions shown.

The contention is that there was no evidence that there was a failure to give the statutory signal required by Section 9943, Revised Statutes 1919. Upon this the evidence for plaintiff was the testimony of the witness Brinkop, who testified that when he heard **Whistle** the first whistle the engine was 400 or 500 feet past the **and Bell.** whistling post, or, within 700 or 800 feet of the crossing, and that he heard no whistle before that; and, that he heard the second whistle an instant before he saw the "flash," and, according to his statement, at the time the train was very near the crossing; and his testimony further was that he heard no bell. By the statute, if the warning be given by the whistle, the whistle must be sounded at least eighty rods from the crossing, and be sounded at intervals until the engine shall have passed the crossing. If the signal be by ringing the bell, the bell must be kept ringing until the engine shall have passed the crossing.

The testimony of Brinkop is somewhat negative in character, but, as was said in Stotler v. Railroad, 200 Mo. l. c. 137, the fact to be proved was a negative fact. According to his testimony, Brinkop's attention was first directed to the train by hearing the whistle, which, as he said, was then 400 or 500 feet past the whistling post, and he heard no other whistle until it was almost upon the crossing. His attention was upon this train because he had just passed the deceased and he said he wondered whether the deceased had reached or passed the crossing. Defendant had testimony not only that the whistle was sounded at the whistling post, but was continuously being sounded to the crossing, and that the bell was ringing during that period. The defendant had the testimony of other witnesses, the Horst brothers, that the whistle was sounded up near the manure pile, and was continuously sounded thereafter, but both of them said they heard no bell. For the purposes of this inquiry plaintiff is entitled to have the evidence in her favor taken as true, and is entitled to all reasonable inferences to be drawn therefrom. Under the evidence we hold that the question whether the statutory signal was given at the whistling post, and the signal whether by bell or whistle, continued until the train reached the crossing, was a question for the jury.

Upon the issue most stressed, that the deceased was guilty of contributory negligence as a matter of law, counsel for defendant invoke application of the statute (Laws 1921, 1st Ex. Sess., p. 91, **Degree** sec. 19) as construed in Threadgill v. Railway Co., 279 Mo. **of Care.** 466; Monroe v. Railroad, 297 Mo. 633; Jackson v. Telephone Co., 281 Mo. 358. It is plain, however, that this case was not tried upon the statutory theory, but upon the theory that the de-

ceased was bound to exercise ordinary care for his own safety, according to the circumstances existing. The answer of defendant did not plead contributory negligence on the part of the deceased, by failure to exercise the highest degree of care, but charged him with negligence, and with failure to "exercise ordinary care." The defendant's instructions numbered 7, 8 and 10 requested by defendant and given by the court, instructed the jury that it was, the duty of the deceased to exercise ordinary care. Thus, under said Instruction 7 the court at defendant's request instructed the jury that "by the term 'ordinary care' with reference to the conduct of plaintiff's husband, is meant that degree of care which a person of ordinary caution and prudence would exercise under the same or similar circumstances." The defendant asked no instruction that it was the duty of the deceased to exercise the highest degree of care. We think that defendant, having framed the issue and tried the case upon the theory mentioned, and made ordinary care the test of the duty laid upon deceased, cannot have the case or the immediate question considered on appeal upon a different theory. [Mirrielees v. Wabash Ry. Co., 163 Mo. 486 and cases there cited.] See also Kenefick v. Insurance Co., 205 Mo. 294; Gordon v. Park, 219 Mo. 600.

It is argued that the situation was such that, for deceased to look, was to see; and to listen, was to hear; and it must be presumed either that he did not look or listen, or that he did not heed what he saw or heard; and that his negligence conclusively appears, and the case is within the rulings in Monroe v. Railroad, 297 Mo. 654; State ex rel. v. Bland, 237 S. W. 1018; Burge v. Railroad, 244 Mo. 76; Kelsay v. Railroad, 129 Mo. 364; Porter v. Railroad, 199 Mo. 82; Huggart v. Railway, 134 Mo. 673; Sanguinette v. Railway, 196 Mo. 466; Evans v. Railway, 289 Mo. 493; Alexander v. Railway, 289 Mo. 599.

**Contributory Negligence.**

Counsel for plaintiff, in their presentation of the case, urge that the plaintiff made a prima-facie case of failure of defendant to give the statutory crossing signals; that under the circumstances of this case, such failure is to be presumed to have been the cause of the death of the deceased; that under the circumstances of this case also, the presumption arose that the deceased was in the exercise of ordinary care, and not guilty of contributory negligence; and that this presumption, arising upon plaintiff's evidence and not dispelled by plaintiff's evidence, cannot be overcome as a matter of law by the oral evidence for defendant, whether such oral evidence was contradicted or not.

We have held there was evidence to go to the jury on the question whether the statutory signals were given. Under that view, the plaintiff made a prima-facie case, unless it also appeared from the plaintiff's case that deceased was guilty of contributory negligence.

In cases where plaintiff's evidence tends to show that the statutory signals were not given, there is the presumption that the failure to give them was the proximate cause of the injury, and the burden of proof is upon defendant to show the contrary. [Pryor v. Payne, 304 Mo. 560; McGee v. Railway, 214 Mo. 530; McNulty v. Railway, 203 Mo. 475; Stotler v. Railway, 200 Mo. 107.]   Of course, in making her case showing negligence of defendant, and failure to give the statutory signals, if plaintiff, in doing so, also showed that deceased was guilty of contributory negligence as a matter of law, then the plaintiff was not entitled to recover.   But, if plaintiff made a prima-facie case, upon failure to give statutory signals, and it does not appear from plaintiff's evidence that the deceased was guilty of contributory negligence as a matter of law, then the burden was upon defendant to make out its affirmative defense of contributory negligence of deceased by a preponderance of the evidence, and the case was one for the jury. The argument that deceased was guilty of contributory negligence is based in part upon the evidence given by plaintiff's witness, the civil engineer, and in part upon the testimony of defendant's witnesses, the fireman and the passenger upon the train.   The argument based upon the testimony of the latter is that they saw the truck when it was within fifteen or twenty feet of the track; that therefore from that distance, deceased could have seen the train, and in the exercise of ordinary care could have stopped his truck, but failing to look or listen, or failing to heed what he saw and heard, he proceeded upon the track, at a speed of fifteen or twenty miles an hour.   But, clearly, the truth or correctness of the statements of these witnesses was a question for the jury, and especially so in view of the fact that the fireman on his cross-examination admitted that, upon the coroner's inquest, his testimony was to the effect that he saw a stopping of the truck upon the track.   The contention based upon the testimony of plaintiff's witness the civil engineer, is, that it is merely a matter of mathematics to demonstrate that the train was in sight of deceased when he was at any point between the crossing, and a point seventy-five feet south of the crossing.   The argument runs upon the theory that the truck was moving ten miles an hour, and the train forty miles an hour; that therefore when the truck was seventy-five feet south of the crossing, the train was 300 feet from the crossing, and was then within view of the deceased, and was within his view, thence, onward to the crossing.   We think this argument leaves out of consideration the fact also testified to by the engineer that at a point 100 feet southeastward from the crossing, the hill in the acute angle in the cut between Vermont Avenue and the cut of the railroad track, was twelve and five-tenths feet higher than the track; and that it continued to be approximately twelve feet higher than the track to a point 250 feet or more from the crossing, sloping off at the 300-foot point.   These

facts fail to demonstrate to our minds that when deceased was seventy-five feet from the crossing he could have seen the train when it was 300 feet distant from the crossing.

According to the testimony of the engineer, one at a point on Vermont Avenue, seventy-five feet south of the crossing, by looking at right angles, could see the track, which, he said, at that point, was forty or forty-one feet from Vermont Avenue. The contention of defendant upon this point leaves out of consideration the testimony of the other witnesses to the effect that, because of the embankment and the growth of weeds and grass thereon, and the acute angle made by the crossing when approaching it from the south on Vermont Avenue, one had to be within a few feet—the witnesses gave it as from four and one-half feet to ten feet of the rails—before you had a clear view of the track. The distances of the truck and the train, respectively, from the crossing, until as they actually reached it, cannot be definitely fixed. It cannot be determined when the driver of the truck looked; or, what effort he made, after looking, to stop the truck, except by inference from the fireman's admission. The evidence of plaintiff's witnesses, and of some of defendant's witnesses, was that when he was last seen by them, about 200 feet from the crossing, the truck was moving "slow," or "very slowly," or, at a "very slow gait."

The cases cited for defendant all stress the duty of the traveller to look and to listen in approaching a railroad crossing, a place, which in itself, is a signal of danger. The cases differ widely from each other in certain particulars. In some, the party struck was killed, and in others was injured and testified as to what he did, and what he saw. Generally, it was held the plaintiff could not recover, because facts showing the plaintiff's contributory negligence were developed in the process of attempting to make the plaintiff's case. In Porter v. Mo. Pac. Railway, 199 Mo. 82, a case cited, the collision resulted in the death of the traveller. In that case the rule was invoked that in the absence of any evidence on plaintiff's behalf as to acts of care on the part of deceased, he was presumed to have looked and listened, and to have exercised ordinary care to have avoided the collision. The allowance of such a presumption was conceded to be the rule; but, in that case it was said the presumption was overcome by "the logical and irresistible conclusion that deceased, had he listened, would have heard the train, and had he looked, he must have seen it in time to have avoided a collision," and that, having failed to take such precautions, he was guilty of negligence as a matter of law. This was said under the facts as to the conditions surrounding the crossing and the opportunity of the deceased, in approaching it, to see the train for a considerable distance. After so holding, the court as additional reason and as strengthening the con-

clusion already reached, referred to the fact that in that case the uncontradicted evidence of the engineer and the fireman, was, that the deceased in fact did look around before entering upon the track, and was seen by them to urge his horses over the crossing of the track. The conclusion that the deceased had full opportunity to see was based upon the character of the surroundings as developed in plaintiff's case. The reference as to the uncontradicted testimony of the engineer and fireman was merely incidental. It would take too much space to state the facts in the other cases cited. Under the facts in this case, viewed from the standpoint of plaintiff, as they must be, the inference could reasonably be drawn that the deceased proceeded slowly; could not see and did not see this train until it was almost upon him, traveling at a speed of forty miles an hour, and that the stopping or appearance of stopping referred to by the fireman in his statement at the coroner's inquest, was an effort made by deceased when coming slowly upon the track, which he could not see until almost upon it, and when he then saw the train approaching, or heard the second whistle mentioned by Brinkop. We have reached the conclusion that under the evidence for plaintiff it cannot be said, as a matter of law, that the deceased was guilty of contributory negligence, or that the presumption he was in the exercise of ordinary care for his own safety, was destroyed by the plaintiff's evidence. That being true, the question of the contributory negligence of the deceased was one for the jury; and the testimony of the fireman and of the passenger upon the train, although not contradicted in a direct way by any witness, except in so far as the fireman contradicted himself, cannot be held to have destroyed the prima-facie case made by the plaintiff. [Bond v. Railway, 288 S. W. 777; State ex rel. Fulton Iron Works v. Allen, 289 S. W. 583; Barz v. Fleischmann Yeast Co., 271 S. W. 361; Peterson v. Railroad, 265 Mo. 479.]

The next assignment of error is directed against plaintiff's Instruction 2. The first objection made is that it submitted the question of negligent speed of the train, when, it is urged, there was **Speed of** no evidence from which the jury could find that the speed **Train.** of the train was unreasonable or negligent. In a preceding paragraph we have held that the question whether the speed of the train was negligent depended upon all the conditions surrounding the crossing—the acute angle, the obstructions to the view, the amount of travel over it, and also, in respect to the question of speed of the train, the fact, not disputed, that there was no flagman, watchman or bell, or other warning device at the crossing. All of these co-existing and related things bore upon the question of what was reasonable speed, or ordinary care in approaching the crossing. The question was one for the jury.

It is next urged that said instruction is erroneous in that it authorized a verdict for plaintiff if defendant failed to give the statutory signal by bell or whistle, and that it was so framed as to require the giving of both, whereas the statute is complied with by the giving of the one or the other. The statute, Section 9943, Revised Statutes 1919, requires the giving of the one or the other, but not the giving of both, and it has been frequently so construed. [Turner v. Railroad, 78 Mo. 578; Halferty v. Railroad, 82 Mo. 90; Cathcart v. Ry. Co., 19 Mo. App. 119; Braddy v. Railroad, 47 Mo. App. 522.] The language of said Instruction 2 complained of here runs: If defendant "negligently failed to give timely warning by bell or whistle of the approach of said train to said crossing at a distance of not less than eighty rods (1320 feet) from said crossing, and to sound the same at intervals thereafter until it had crossed said Vermont Avenue." The instruction is awkwardly drawn and is subject to criticism; but, it cannot be held, we think, that it could be understood by the jury to mean that defendant was bound both to ring the bell and sound the whistle at the crossing, and to keep the bell ringing and sound the whistle at intervals thereafter until the crossing was passed. It expressed the requirement of warning by bell or whistle at the whistling post. The requirement stated thereafter, to sound the same at intervals, was a somewhat awkward method of requirement of the sounding of the one or the other. The words "the same" referred to bell or whistle, and not to both bell and whistle.

**Warning by Bell and Whistle.**

Complaint is made of the final paragraph of said Instruction 2. This paragraph is as follows: "Or if the jury further find and believe from the evidence that the surrounding circumstances and conditions of said crossing on and prior to July 14, 1922, rendered said railroad crossing unusually dangerous and hazardous and that under the circumstances and conditions then existing you find and believe from the evidence that railroad management in the exercise of ordinary care required that a flagman or watchman, or alarm bell or some other device or means be placed at said crossing to warn persons crossing said railroad at said place of the approach of trains thereon, and if you further find that defendant failed to use such precaution as you may find from the evidence ordinary care required; and that in so doing, if you so find, any or all of the aforesaid acts or things caused the said Charles J. Toeneboehn to be injured and killed, if you find that he was injured and killed, without any negligence on his part directly contributing thereto, then your verdict should be for the plaintiff." The chief objection made to the paragraph quoted is that it permitted the jury, without any evidence to guide them, to set up their own standard as to what "railroad management in the exercise of ordinary

**Standard of Ordinary Care.**

care." required with respect to placing a watchman, flagman or alarm bell or other device at the crossing. Condemnation of so much of the instruction is urged under what was said in Chrismer v. Telephone Co., 194 Mo. 189; Harrelson v. Railroad, 151 Mo. 482. We think it is not subject to the objection urged against it. It is suggested also that it constituted a "roving commission to the jury" to find that the defendant "failed to use such precaution as they might find from the evidence, ordinary care required." The character of the crossing and the conditions surrounding it, the frequency of travel over it, the failure to have a watchman, flagman or any other warning bell or device, were all matters hypothesized in the preceding paragraph of the instruction. Taking the whole of this quoted paragraph, it would not submit merely whether in the judgment of the jury due care required the defendant to keep a flagman, bell or other warning device, nor whether that was a suitable mode of giving notice of the approach of a train, nor what signal or device would be sufficient, but altogether, and in its ultimate effect, it submitted the question whether, under the actual circumstances, the defendant exercised reasonable care in what it did, and whether its neglect to use ordinary care caused the injury complained of. For a discussion of the various phases of the question of failure to maintain a flagman at a crossing, we refer to the annotation heretofore mentioned, 16 A. L. R. 1273.

Complaint is made of Instruction 4 for plaintiff under the claim that it informed the jury the deceased was not guilty of contributory negligence, if they found that he exercised ordinary care; **Highest** and it is urged that the measure of care required of him was **Degree** the highest degree of care. As to this it is enough to refer **of Care.** to what has heretofore been said and to the fact that defendant in its own behalf asked and was given like instructions, making "ordinary care" the measure of care to be observed by the deceased.

Complaint is made of plaintiff's Instruction 5, which told the jury that contributory negligence on the part of deceased will not be presumed merely from the fact that he was injured and killed, but that **Failure** contributory negligence on his part in order to constitute **to Look** a defense, must be shown by a preponderance of the evi- **or Listen.** dence. The objection made is that the instruction was prejudicial, because, under all the evidence, for deceased to look, was to see, and to listen, was to hear; that under those circumstances the presumption arose that he did not look or listen, or, that if he did, he did not heed what he saw or heard. The objection is but a repetition of the contention heretofore considered—that deceased was guilty of contributory negligence as a matter of law. Under that we have given consideration to the cases cited: Kelsay v. Railroad, 129 Mo. 362; Hayden v. Railroad, 124 Mo. 572, and to

State ex rel. v. Bland, 237 S. W. 1018, wherein the cases mentioned, and others, are reviewed, in the opinion by GRAVES, J. In the last-named case, in the reference to other cases, consideration was given to the imperative requirement that the traveller must look carefully in both directions at a convenient distance from the crossing, before venturing upon it, if by looking a train could be seen. It was said in Kelsay's case there was a clear space of twenty-five feet after all obstructions were passed; and in Hayden's case a space of fifteen, twenty-five or thirty feet, and that in the latter case it was made clear that the deceased had at least fifteen feet of clear space in which he might have seen the train had he looked; and it was ruled that fifteen feet of clear space was sufficient in which to discover the train had he looked, and that he could not have looked, for to look was to see. There was no such clear showing in the instant case.

Counsel for defendant argue that the fireman from his place in the engine and at a distance of from fifty or sixty feet from the crossing, saw the truck of deceased when fifteen or twenty feet from the crossing; and that, if the fireman could thus see the deceased, the deceased could equally have seen the train. But that statement of the fireman cannot entirely control. His other admitted statement and the other circumstances shown must be allowed to carry their natural or reasonable inference. Under certain of the matters detailed it could be seen that a locomotive, coming as this one was at a speed of more than sixty feet per second, and first seen when it was 100 feet or more away, might catch the truck, which halting, came on the crossing in an endeavor of the driver to look down the track.

Objection is made to plaintiff's Instruction 6 on the amount of the recovery. It is said that the instruction does not direct the jury to assess a penalty against the defendant in the event they found for

**Penalty or Damages.** plaintiff, but proceeds upon the theory of damages, and authorizes the jury in determining the amount of their award, to consider pecuniary loss. The instruction does not use the word "penalty," nor does it use the word "damages." The instruction complained of is a literal copy of the instruction given in Ward v. Mo. Pac. Ry. Co., 277 S. W. l. c. 912, and there set out. The giving of that instruction was held not reversible error upon hearing of that case, in Court en Banc; and this point is also ruled against defendant.

Following the conclusions heretofore stated, the judgment is affirmed. *Seddon* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.