THE STATE EX REL. MAMIE MACLAY v. ARGUS COX ET AL., Judges of Springfield Court of Appeals.—10 S. W. (2d) 940.

Division One, October 3, 1928.

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for relator.

*Thomas J. Cole, Arnot L. Sheppard* and *J. C. Sheppard* for respondent.

SEDDON, C.—This is an original proceeding in certiorari, commenced in this court, wherein the relator, Mamie Maclay, seeks the quashal of the opinion, judgment and record of the Springfield Court of Appeals in the certain cause, entitled, "Mamie Maclay, respondent,

v. Missouri Pacific Railway Company, appellant," commenced in the Circuit Court of Iron County, and appealed to the Springfield Court of Appeals. The plaintiff in the latter cause (relator herein) sued to recover damages for the alleged wrongful death of her husband, John Maclay, who was struck and killed, on September 12, 1923, by defendant's railroad train while he was driving an automobile upon a public road at its intersection with defendant's mainline railroad track near the town of Summit, Missouri. Plaintiff recovered a judgment against said defendant railway corporation in the sum of $5000, from which judgment the defendant appealed to the Springfield Court of Appeals. An opinion was filed in the latter court, at the October term, 1926, affirming the judgment of the Circuit Court of Iron County. Subsequently, a rehearing of the cause was granted and the cause was reargued and resubmitted in said Court of Appeals, at the March term, 1927, resulting in the filing of an opinion reversing outright the judgment of the Circuit Court of Iron County. Relator, claiming that the latter opinion is in conflict with certain controlling decisions of this court, in due time applied to this court for the issuance of a writ of certiorari, and the record of said Court of Appeals has been returned to this court in compliance with our preliminary writ issued upon relator's application.

The evidentiary facts, and the ultimate conclusion of law reached by said Court of Appeals upon such facts, are thus stated in the opinion of that court:

"Plaintiff in her petition charged negligence in the failure of defendant's servants to observe the statutory signals and in operating the train at a dangerous rate of speed, considering the character of the crossing. The answer consisted of a general denial and a plea of contributory negligence.

"Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given. The facts are substantially as follows: Plaintiff's husband, John Maclay, was about sixty-one years of age and in perfect health at the time of his death. His hearing and eyesight were unimpaired. He was manager of the Potosi Mill & Elevator Company and had lived in that community many years. Summit is a flag station located at the peak of a hill on defendant's railroad; at that point the railroad runs north and south; the crossing where deceased was killed is located about one quarter of a mile north of Summit; there is a wood and lumber yard about 225 yards north of the station, on the east side of defendant's tracks; a spur track ran from defendant's main-line track to this yard, entering it at the north end, where there was a gate situated about 400 feet south of the crossing; at the time of the ac-

cident wood was stacked along this spur track, about two cords high, for a distance of 310 feet; there was also a thick growth of trees with dense foliage along the spur track; there was much evidence that, between the north end of the wood yard and the crossing, and east of the main-line track, weeds and a new kind of clover, which seems to attain a height of some five feet, were growing on defendant's right of way at the time of the accident. This clover and weeds are out of the case, however, as it is quite clear deceased's vision was not materially obstructed thereby. The highway on which deceased was driving at the time of his death runs parallel to the railroad track for almost a quarter of a mile and then curves a little to the northeast and then turns back northwest about fifty yards from the crossing; the roadway is some eight feet lower than defendant's track, and as it turns west, about fifty or sixty feet from the tracks, it approaches the crossing on a dump; on account of the cord wood and trees heretofore mentioned, defendant's tracks could not be seen by a person traveling north along the public road until the train would be within two or three hundred feet and the person on the road within fifty or sixty feet of the crossing, or just at the point where the public road turned west before reaching the crossing; after passing this point to the crossing the road was rather steep. Deceased was familiar with this crossing.

"At the time of the accident he was driving his automobile along this public road in a northerly direction, which was the same direction the train was running that killed him; the train, as it approached this crossing, was going at the rate of about forty miles per hour; it was downgrade and the locomotive was 'coasting,' making very little noise.

"Besides the engineer there was but one eye-witness to the accident, a Charles Marler, who testified on behalf of defendant as follows: 'I saw him (plaintiff) coming down the road. I was between seventy-five and eighty yards from the railroad, northeast of the crossing. I saw him coming down the road, and I watched him to see if he was going to try to beat the train across the crossing, and I could see the train, and he reached down to shift his gear, and just as he ran on the track the train hit him. He did not stop before he got on the track. He slowed up a little bit to pick up speed. He slowed up and then he picked up speed again. I saw him in the car. I don't think he had any curtains on the car. It looked to me like he was looking towards Potosi. From where he was he couldn't have seen the train until he was two telegraph poles from the crossing. Then he was close enough to see it. I could see it all the way. I never noticed to see whether he was looking toward the train or not. I never noticed that. Just when he run on the track was when the

train hit him and turned him right around. The automobile had not stopped before the train hit it; it wasn't still. He was coming about ten miles an hour. I can't say whether he shifted the gears or not. It looked to me like he did. He made a motion with his hands and that is what I thought he was aiming to do.'

"On redirect examination, he testified that: 'I did not say he was in a little hollow and couldn't see the train. When he got up on the dump he could see it. When he went to shift his gears he was looking down, wasn't noticing the train.'

"On recross-examination, he further testified that: 'This dump is right there at the track. When you are on the dump you are on the track. I was seventy-five or eighty yards away. My father was with me. I couldn't tell which way he was paying attention to.'

"The evidence also showed this witness was seventy-five or eighty yards northeast of the crossing, on higher ground than deceased; there is no evidence that he made an examination as to the view from the point where deceased was approaching the crossing.

"George Wallace, plaintiff's brother, testified that he went over the next morning after the accident to ascertain the probable cause of deceased's death; that the wood at the wood yard along the switch track was ranked up as high as you could throw it off a wagon; that he 'made a trip over there after this accident, and I was watching for the train, and it took seven seconds from the time you saw the train until it hit the crossing. Q. Where is the point you could see the train? A. A little bit north of Cordias' wood yard. Q. What would you say as to the distance from the crossing? A. I would say it was two or three hundred feet, possibly. That is the first point I could see the train. Q. Where would you be standing to see the train at that place? A. Right where he was supposed to have shifted gears. Q. Where was that? A. Down in this little branch before you make the turn to go up on the crossing. Q. That would be how far up to the track? A. Fifty or sixty feet. Your view would not increase any as you pass over that fifty or sixty feet. You would have to be nearly up to the track before you could see up on the dump. Q. And, as you would keep coming up over that fifty feet, your view wouldn't be extended very much farther?'

"The foregoing statement of facts, taking the evidence most favorable to plaintiff, may be briefly summarized as follows: A train coming north on defendant's main-line track could not be seen by deceased, in the position he was at the time, until it emerged, from a point about opposite the north end of the wood yard; at that moment, assuming the deceased was at the place where the public road turned north, he would have been about fifty feet from the east rail of the track at the crossing and the train would have had to have been within approximately 200 feet of the crossing in order

for it to have been within his line of vision; it is practically conceded the sweet clover and weeds were not of sufficient height to obstruct the view at that point; the train which struck deceased was coasting downgrade, making very little noise, comparatively, and was traveling at the rate of about forty miles per hour; the statutory signals were not given; deceased was driving his car at the rate of about ten miles per hour; deceased, who was familiar with the crossing, did not stop his car, but slowed up some, evidently to shift the gears on his car as he came up the grade, the public road having a rise of about eight feet in the fifty feet. The only eyewitness except the engineer was the witness Marler, who testified that when deceased went to shift his gears 'he was looking down; wasn't noticing the train.'

"Upon proof that the statutory signals were not given, plaintiff made a prima-facie case. [Pierson v. Railroad, 275 S. W. 561.]

"The defendant had a right to show the failure to give the signals did not cause the injury (Sec. 8843, R. S. 1919). This statute has apparently been interpreted to mean that defendant railroad may prove contributory negligence as a defense. If the statute were strictly followed the issue would be whether or not failure to give the statutory signals caused the injury, and not that the injured party was guilty of contributory negligence. No such distinction is raised, however, in this case. The question then is, whether or not deceased was guilty of such contributory negligence which would bar his recovery as a matter of law. The cause was tried upon the theory that deceased was required to exercise only ordinary care when approaching the crossing with his automobile. Could deceased, by exercising ordinary care, have seen defendant's train in time to have avoided the accident? This involves some computations, which, although in most cases more or less speculative, are of importance in measuring the degree of care exercised under such circumstances as we are confronted with here. If the train was traveling forty miles per hour, it would travel the 200 feet between the last obstruction and the crossing in approximately four seconds of time; deceased, driving his car at the rate of ten miles per hour, would travel fourteen and seven-tenths feet per second, and in four seconds would have traveled about fifty-eight feet. In other words, when deceased arrived at the point where the public road turned north, fifty feet from the track, the train must have been within 200 feet and, according to the evidence, could have been seen by deceased had he looked.

"It has become an established principle of law in this State that a railroad is a signal of danger, and if to look or listen will enable

one approaching a railroad track to see or hear an approaching train, failure to do so is negligence as a matter of law. [Burge v. Railroad, 244 Mo. 76, 148 S. W. 925; Morrow v. Hines, 233 S. W. 493.]

"It is also well settled that it becomes the duty of a person about to enter upon a railroad crossing in an automobile to approach the crossing with his car under control and at a rate of speed so that he can readily stop after reaching a point where he can see an oncoming train and before coming within the danger zone. [Evans v. Railroad, 289 Mo. 493, l. c. 502, 233 S. W. 397.]

"In State ex rel. v. Bland, 237 S. W. 1018, l. c. 1019, the law was further elaborated as to the duty of the operator of an automobile by the statement that, 'if objects obstruct the view, or noise interfere with his hearing, his conduct must meet these conditions before he has exercised ordinary care for his own protection under the circumstances surrounding him.' In that case, the injured party could have seen the top of the train when within fifty feet of the track and the whole train when within eighteen to twenty feet thereof, traveling at about six to ten miles per hour, and recovery was denied. In the case at bar, if deceased had slowed up so that he was traveling but five miles per hour he would have traveled twenty-nine feet, and there was unquestionably more clear space between deceased and the crossing to allow him to see the train than there was in the Hines case (supra). Of the same import are many other Missouri decisions, among them being the following: Dickey v. Railroad Co., 251 S. W. 112; Alexander v. Railroad Co., 233 S. W. 44; Hayden v. Railroad Co., 124 Mo. 566, 28 S. W. 74; Tannehill v. Railroad, 279 Mo. 158, 213 S. W. 818.

"It is urged by plaintiff that the law laid down in Degonia v. Railroad Co., 224 Mo. l. c. 595-599, 123 S. W. 807, to the effect that ten seconds of time was not sufficient in which to stop a train traveling twelve miles per hour, should be turned about and applied to the driver of an automobile. The argument is thus stated: 'If a railroad company is to be held, as a matter of law, *not negligent* in failing to stop a train going twelve miles per hour to save a life, then deceased should not, as a matter of law, be held to be guilty of contributory negligence barring his widow's right to recover for his death in not stopping his automobile, going ten miles an hour, in less than four seconds.' The argument is more specious than sound. It overlooks the law, as set forth in the cases heretofore cited, that the driver of a car must have it reasonably under control when he approaches a crossing so that it can be readily stopped at the first appearance of danger. The same duty is not imposed upon the operators of a ponderous locomotive. Obviously, the same rule could not be applied to both a railroad locomotive and an automobile.

"Plaintiff relies chiefly on the case of Jackson v. Railroad, 189 S. W. 381, as upholding her right to have the question of contributory negligence submitted to the jury. The evidence in that case indicated that plaintiff looked when he first had a clear view in the direction from which the street car was coming, but no car was in sight, whereupon he looked in the opposite direction, which he was bound to do. When he again looked in the direction of the street car he saw the car, but it was too late to avoid the collision. In the case at bar the physical facts indicate deceased did not look; moreover, the sole eyewitness testified that deceased did not look while he was apparently shifting his gears. He was then in the danger zone and it was his duty to have looked. The train must have been within his line of vision at that time, and we are unable to arrive at any other conclusion under the decisions but that he was guilty of contributory negligence as a matter of law. Holding to that view, it is unnecessary to consider other assignments. It does not seem that a new trial would permit of a different result. The judgment should, therefore, be reversed. It is so ordered."

It will be readily seen from the foregoing opinion of respondents, as stated in the printed brief and argument of relator and as conceded by respondents in their printed brief and argument, that "the sole point decided by the respondents is that the deceased was guilty of contributory negligence as a matter of law," and, hence, that relator is barred from recovering for the death of her deceased husband upon the particular cause of action pleaded and submitted by her, which was the primary negligence of the agents and servants of the defendant railway corporation, in charge of the operation of its train at the time of deceased's fatal injury, in failing to give the statutory warning signals when the train was approaching the public crossing, and in operating said train at a dangerous and unlawful rate of speed over said crossing. If, therefore, the opinion of respondents is in conflict with a decision of this court which has been ruled upon a like or similar state of facts, or if the opinion of respondents contravenes a decision of this court as regards a general principle of law announced by this court, the opinion, judgment and record of respondents herein must be quashed; otherwise, our writ of certiorari issued herein must be quashed as having been improvidently granted and issued. [State ex rel. v. Reynolds, 287 Mo. 169; State ex rel. v. Reynolds, 289 Mo. 506; State ex rel. v. Allen, 294 Mo. 214; State ex rel. v. Trimble, 250 S. W. 384.]

Relator strenuously insists that, upon the evidentiary facts as found and stated by respondents in their opinion, the relator's deceased husband cannot be held to have been guilty of contributory negligence as a matter of law, and that, in holding that decedent was guilty of contributory negligence as a matter of law, the opinion and

decision of respondents contravenes certain controlling decisions of this court, which are cited by relator as follows: Jackson v. Railroad Co., 189 S. W. 381; Toeneboehn v. Railway Co., 298 S. W. 795; Peterson v. Railway Co., 265 Mo. 462; McGee v. Railroad Co., 214 Mo. 530; Monroe v. Railroad Co., 280 Mo. 483; State ex rel. v. Reynolds, 286 Mo. 204; McDaniel v. Hines, 292 Mo. 401; Johnson v. Railway Co., 77 Mo. 546; Shaffer v. Railway Co., 300 Mo. 477; Brown v. Railway Co., 252 S. W. 55; State ex rel. v. Trimble, 254 S. W. 846; and Pienieng v. Wells, 271 S. W. 62.

It would unduly extend the length of this opinion to undertake to discuss and review herein each and all of the above-cited decisions of this court which relator claims are in conflict with the opinion of respondents under review in this original proceeding. Suffice it to say that we have thoughtfully and carefully read and analyzed all of the several decisions cited and relied upon by relator, and find them to be materially different, as regards their evidentiary facts, from the opinion of respondent above quoted and herein under review. In many, if not most, of the cases cited by relator, the evidence tended to show that the injured party looked for an approaching train before reaching the danger zone, but saw and heard no approaching train because of obstructions which extended within only a very few feet of the railway track, and which prevented his seeing or hearing such train until he was actually within the immediate danger zone, or within only a very few feet therefrom, and when the time and distance were too short to have allowed the injured party to stop his vehicle, before entering upon the railroad track, and thereby to have avoided the injury. Moreover, some of the cited cases were submitted upon the humanitarian doctrine or rule of negligence, as to which theory or doctrine of negligence contributory negligence of the injured party ordinarily is not a complete defense or bar to a recovery.

The decisions of this court upon which relator seems to place chief reliance are Jackson v. Railroad Co., 189 S. W. 381, and Toeneboehn v. Railway Co., 298 S. W. 795. The Jackson case is cited and referred to in respondents' opinion, and seemingly was deemed by respondents to be substantially and materially different in its evidentiary facts from the case ruled by respondents. In the Jackson case, the evidence on behalf of plaintiff, who was approaching a railway track upon a motorcycle, disclosed that his view of the railway track was obstructed by a concrete wall about four and one-half feet high, and by shrubbery and vines growing along the outside of said wall, until plaintiff had approached within about forty or fifty feet of the railway track. Plaintiff, himself, testified that, when he came from behind the concrete wall, he looked to the north,

up and along the railway track upon which the car was approaching, and saw no car; that he then looked to the south, and seeing nothing, went on; that he never had time to look again, and that he could not remember what followed thereafter. The defendant's motorman testified that, when his car was about 200 feet from the crossing, he saw plaintiff come into view about fifty feet away from the track; that plaintiff was looking at the approaching car and began to slow down and attempted to stop his motorcycle, but could not stop until he got upon the track. The testimony of the motorman in that case rather tended to aid the plaintiff's case. This court (one of the judges dissenting), en banc, ruled that, under the evidence in that case, the question of plaintiff's contributory negligence was properly submitted to the jury.

In the Toeneboehn case (which was ruled by this division of this court), the evidence on behalf of plaintiff tended to show that plaintiff's decedent, who was driving an automobile truck, because of certain obstructions to his view, could not have seen the approaching train which struck his automobile and killed him until decedent was within only four and one-half to ten feet of the track, from which evidentiary facts we made the finding that, "under the facts in this case, viewed from the standpoint of plaintiff, as they must be, the inference could reasonably be drawn that the deceased proceeded slowly, and could not see and did not see this train until it was almost upon him, traveling at a speed of forty miles an hour." [298 S. W. 1. c. 803.] Wherefore, we reached the legal conclusion in the Toeneboehn case "that under the evidence for plaintiff it cannot be said, as a matter of law, that the deceased was guilty of contributory negligence, or that the presumption he was in the exercise of ordinary care for his own safety was destroyed by the plaintiff's evidence; that being true, the question of the contributory negligence of the deceased was one for the jury." We think, however, that the evidentiary facts in the Toeneboehn case clearly differentiate that case from the one now before us.

Relator urges that plaintiff made a prima-facie case upon the failure of defendant railway corporation, and the operatives of its train, to give the statutory crossing signals (as is conceded by respondents' opinion); that such failure to give the statutory signals must be presumed to have been the proximate cause of the death of decedent; that the presumption also arises that decedent (he being dead and unable to testify as to what he saw and did) was exercising ordinary care at the time of his death, and that, therefore, it must be presumed that he did look and listen for an approaching train before entering the danger zone, and, being presumed to have looked and listened, that he did not see or hear, and could not have

seen or heard, the approaching train (which, according to the opinion of respondents, was "coasting" downgrade, making very little noise, without giving any warning signals of its approach) until decedent had entered the immediate danger zone, and until the time and distance were too short to stop his automobile and avoid collision with the train. Relator therefore insists that it does not appear from the evidence offered on behalf of plaintiff that decedent was guilty of contributory negligence as a matter of law, but that respondents, in stating the evidentiary facts in their opinion, have sought to overcome the effect of the legal presumptions to which plaintiff is entitled, and of the prima-facie case made by plaintiff's evidence, by the testimony of the witness Charles Marler, who (respondents' opinion shows) was a witness for the defendant railway corporation. Relator argues that, plaintiff having made a prima-facie case by her own evidence, thereby entitling her to go to the jury upon her evidence, the cause could not be peremptorily taken from the jury, for the reason that, after plaintiff had made a prima-facie case by her own evidence, the burden of evidence thereupon shifted to defendant to produce countervailing proof or evidence, and, however strong the defendant's countervailing proof of decedent's contributory negligence may be, nevertheless, the credibility of defendant's witnesses, and the weight to be given to their testimony, are matters which are solely and exclusively for the jury, and not for a court, to pass upon and determine. Hence, relator urges that the opinion of respondents, in holding and ruling that the decedent was guilty of contributory negligence as a matter of law, which ruling (relator claims) is bottomed solely upon the testimony of the witness Marler, introduced by defendant after plaintiff had concededly made a prima-facie case of defendant's negligence in failing to give the statutory crossing signals, contravenes the decisions of this court in the following cases: Peterson v. Railway Co., 265 Mo. 462; Barz v. Fleischmann Yeast Co., 308 Mo. 288; Bond v. Railway Co., 315 Mo. 987; and State ex rel. v. Allen, 289 S. W. 583.

We believe, however, that relator has misconstrued the opinion of respondents when relator says that the conclusion reached by respondents that decedent was guilty of contributory negligence as a matter of law is bottomed solely upon the testimony of defendant's witness Marler. Respondents, in their opinion, quote at some length the testimony of relator's brother, George Wallace, who testified as a witness on behalf of plaintiff (relator) at the trial of the original cause, to the effect that he (Wallace) went to the scene of the accident on the morning after decedent's injury and death, for the purpose of ascertaining the cause of decedent's death; that he watched from the road for a train approaching the crossing, and that "it took

seven seconds from the time you saw the train until it hit the crossing;" that, standing at the point where deceased was supposed to have shifted the gears of his automobile, which the witness for plaintiff testified was a distance of fifty or sixty feet from the track, he could see an approaching train when the train was 200 or 300 feet from the road crossing. From such testimony of plaintiff's own witness, the respondents found the evidentiary facts to be that deceased "would have been about fifty feet from the east rail of the track at the crossing and the train would have had to have been within approximately 200 feet of the crossing in order for it to have been within his line of vision," and, "when deceased arrived at the point where the public road turned north (west?), fifty feet from the track, the train must have been within 200 feet and, according to the evidence, could have been seen by deceased had he looked." In concluding, the opinion of respondents recites: "In the case at bar, *the physical facts indicate deceased did not look;* moreover, the sole eyewitness testified that deceased did not look while he was apparently shifting his gears. He was then in the danger zone and it was his duty to have looked. The train must have been within his line of vision at that time, and we are unable to arrive at any other conclusion under the decisions but that he was guilty of contributory negligence as a matter of law." (Italics ours.)

As we view and construe the opinion of respondents, the evidentiary facts found and stated therein (upon which facts respondents reached the legal conclusion that deceased was guilty of contributory negligence as a matter of law) were supplied by plaintiff's own evidence, rather than by defendant's evidence. In other words, we think that respondents' finding of fact that the deceased had full opportunity to see the approaching train in time to have avoided injury was based upon the character of the surroundings, or *physical facts,* as shown and developed in plaintiff's case in chief, and that the reference made in the opinion of respondents to the testimony of the eyewitness, Marler, who was defendant's witness, is merely incidental, and is given as an additional reason as strengthening the finding and conclusion reached by respondents, under the facts as to the physical conditions surrounding the crossing and the opportunity of deceased, in approaching the crossing, to see the train in time to have avoided injury, which facts were developed in the process of making plaintiff's case. [Toeneboehn v. Railway Co.. 298 S. W. l. c. 802, 803.] In the Toeneboehn case, supra, we said: "Of course, in making her case showing negligence of defendant, and failure to give the statutory signals, if plaintiff, in doing so, also showed that deceased was guilty of contributory negligence as a matter of law, then the plaintiff was not entitled to a recovery."

And so we said, in McGee v. Railroad Co., 214 Mo. 530, 545: "Though the burden is put by statute on defendant to show that the failure to ring a bell or blow a whistle did not cause the injury, yet in carrying that burden defendant need not introduce testimony of its own to show that a failure to give the crossing signals did not cause the death of decedent; *for it is settled law that such fact may appear from plaintiffs' own proof*. For example, plaintiffs' proofs may show that the injured party was guilty of contributory negligence coincident and concurrent in time and place with the negligence of defendant and when that is made to appear an action cannot be maintained." (Italics ours.)

In Evans v. Railroad Co., 289 Mo. 493, 501, decided by this court, en banc, on July 22, 1921, a recovery was denied plaintiff for the death of her husband, who was killed by defendant's railroad train upon a public street crossing while driving an automobile thereon. The uncontradicted evidence in that case (according to our opinion therein) showed that defendant's train was moving at a rate of forty or forty-five miles per hour; that no bell was rung or whistle blown to give warning of its approach; and that a train could be seen for a distance of several hundred feet at a point fifteen feet from the railroad tracks. We therein said: "The acts of respondent's husband, as shown by the evidence before us, in attempting to cross the railroad tracks in broad daylight at a point where he had reason to expect trains at any moment and where he had an unobstructed view of any trains that might be approaching the crossing, without looking for a train or where, if he had looked, he could have seen the train approaching for a distance of three to six hundred feet, constituted negligence on his part that would bar a recovery by his widow in an action based on an allegation of negligence. [Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Huggart v. Railroad, 134 Mo. 673; Stotler v. Railroad, 204 Mo. 619.] . . . At and from a point about fifteen feet from the track deceased could have seen the train coming if he had looked. There was no obstruction to the view. No reason why the approaching train could not have been seen is given. . . . It was his duty to approach the crossing at such speed that he could stop after reaching a point where he could see the approaching train and before coming within the danger zone."

In State ex rel. Hines v. Bland, 237 S. W. 1018, 1019, decided by this court, en banc, on February 9, 1922, we quashed the opinion of the Kansas City Court of Appeals affirming a judgment in the trial court recovered by plaintiff, who was the driver of an automobile, for injuries suffered by him when his automobile was struck by defendant's locomotive upon a public road crossing. The evidentiary

facts (as recited in the opinion of said Court of Appeals therein under review) showed that the plaintiff's view of the railroad track in the direction from which the locomotive was approaching was obstructed until he reached a point about eighteen or twenty feet from said track, and that no warning signal by bell or whistle was given by the operatives of the approaching locomotive. We therein said: "The least that the law demands of one approaching a railroad crossing is the exercise of ordinary care and prudence for his own safety, and this is required, although the railway company may be guilty of negligence. These crossings are signals of danger to the traveler upon public highways. [Burge v. Railroad, 244 Mo. 1. c. 94, 148 S. W. 925.] One approaching a railroad crossing knows that he is approaching danger, and must act in accordance with that knowledge, and in accordance with the rule of ordinary care, to protect himself from danger. What is ordinary care upon his part under one state of facts might not be ordinary care under other and different facts. If objects obstruct his view, or noise interfere with his hearing, his conduct must meet these conditions before he has exercised ordinary care for his own protection under the circumstances surrounding him. . . . The surroundings in this case called for vigilance upon the part of plaintiff. They were such as called for, not only the exercise of his sight and hearing, but as to require him to at least approach the crossing with his automobile under such control, and run at such speed, that it could be readily stopped upon the first appearance of danger. As said railroad crossings have long been held to be signals of danger to the traveler upon the highway, and if obstructions add to this danger, ordinary care for self-protection requires a commensurate care upon the part of the traveler. These are but general observations as to fixed rules, and rules most thoroughly recognized in the jurisprudence of Missouri."

In both the Evans and Hines cases, supra, the view of the injured party in the direction of the approaching train was obstructed until he came within only fifteen to twenty feet of the railroad track, whereas, in the present case, the evidence on behalf of plaintiff (relator here), as found and recited by respondents in the opinion under review, and as shown by the testimony of plaintiff's witness, George Wallace, discloses that the view of the deceased in the direction of the approaching train was unobstructed when he reached a point about fifty or sixty feet from the railroad track, at which point, according to the testimony of plaintiff's witness, Wallace, deceased could have seen the approaching train when the train was 200 or 300 feet from the crossing. It is clear, therefore, that, under the physical surroundings in the present case, as shown by the testimony of plaintiff's own witness, Wallace, the deceased had a

greater distance and time within which to have seen the approaching train and to have avoided the collision than did the injured party in either the Evans case, or the Hines case, both of which cases were followed by respondents herein and cited in support of the legal conclusion reached by respondents.

If it can be rightly said, as claimed by relator, that the opinion of respondents herein is in conflict with the decision of this court, en banc, in Jackson v. Railroad Co., 189 S. W. 381 (the correctness of which claim of conflict we do not concede, however), nevertheless, the decisions in the Evans and Hines cases, supra, both of which cases were likewise decided by this court, en banc, were filed and promulgated at a later date than the decision in the Jackson case, which was filed and promulgated on November 11, 1916. The rulings made, and the legal conclusions reached, by this court, en banc, in the Evans and Hines cases, so far as we find, have never been criticized, modified, or overruled by this court in any subsequent decision; therefore, the rulings made in those cases are "the last previous rulings of the Supreme Court" upon the question of law involved and ruled in the present case, and such rulings, by virtue of Section 6 of the Amendment of 1884 to Article VI of the Constitution of this State, are made "controlling authority in said Courts of Appeals." It is apparent that respondents herein, mindful of the constitutional mandate aforesaid, followed "the last previous rulings" of this court, en banc, as announced in the Evans and Hines cases, as being the "controlling authority" upon the respondents, as judges of the Springfield Court of Appeals.

The opinion of respondents, under review herein, does not appear to be in conflict with, or to contravene, any controlling decision of this court to which our attention has been directed; on the other hand, respondents' opinion appears to be in full and complete harmony with our latest rulings and decisions upon the identical legal question involved and ruled in respondents' opinion.

It follows that our preliminary writ of certiorari herein was improvidently issued, and hence said writ must be quashed. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.