

# In the
# Missouri Court of Appeals
## Western District

THOMAS DUBUC,     )
            )
     Respondent,   )  **WD82809**
            )
v.           )  **OPINION FILED: March 3, 2020**
            )
TREASURER OF THE STATE OF )
MISSOURI - CUSTODIAN OF THE )
SECOND INJURY FUND,   )
            )
     Appellant.   )

### Appeal from the Labor and Industrial Relations Commission

Before Division Two: Cynthia L. Martin, Presiding Judge, Thomas H. Newton, Judge
and Gary D. Witt, Judge

The Treasurer of the State of Missouri in its capacity as the custodian for the Second

Injury Fund ("Second Injury Fund" or "Fund") appeals from the Labor and Industrial

Relations Commission's ("Commission") determination that the Second Injury Fund is

liable to Thomas Dubuc ("Dubuc") for permanent total disability benefits. The Second

Injury Fund argues that the Commission erroneously interpreted and applied the law.

Because the Commission determined the Fund's liability by erroneously relying on section 287.220.2 instead of section 287.220.3, we reverse and remand.[1]

## Factual and Procedural History[2]

On October 30, 2015, Dubuc fell off a ladder while running fiber optic lines between telephone poles as an employee for OTG, LLC ("Employer"). Dubuc drove himself to a friend's house, where an ambulance was waiting to take him to the emergency room at Capital Region Medical Center in Jefferson City. Dubuc complained that he was suffering from pain in his left wrist and in his back. Dubuc was diagnosed with a minimally displaced intra-articular fracture of his left wrist, and the treating doctor noted tenderness along Dubuc's posterolateral ribs. As the hospital prepared to discharge Dubuc, Dubuc noticed blood in his urine. A CT scan revealed that Dubuc had suffered a laceration of his left kidney with perinephric hematoma. Dubuc was transferred and admitted to University Hospital in Columbia for additional treatment. Dubuc remained hospitalized for seven days. When Dubuc was discharged on November 6, 2015, he was given instructions to follow up with the orthopedic surgeon and the urology department, and to avoid weight bearing activities with his left arm.

After approximately six months of follow-up appointments, Dubuc was seen by his orthopedic surgeon for the final time on May 20, 2016. The orthopedic surgeon's notes

---

[1]All statutory references are to RSMo 2000 as supplemented through October 30, 2015, the date of Dubuc's compensable workplace injury, unless otherwise indicated.

[2]"In reviewing the Commission's decision, we view the evidence objectively and not in the light most favorable to the decision of the Commission." *Moss v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 570 S.W.3d 110, 113 n.2 (Mo. App. W.D. 2018) (quoting *Poarch v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 365 S.W.3d 638, 642 (Mo. App. W.D. 2012)).

2

indicated that the fracture to Dubuc's left wrist had healed. Those notes further indicated that the numbness and tingling Dubuc was experiencing "on the left side" was consistent with carpal tunnel syndrome and lateral epicondylitis, neither of which was related to his October 30, 2015 injury. The orthopedic surgeon released Dubuc for normal activities.

Dubuc filed a claim for workers' compensation benefits on November 20, 2015, seeking compensation for injuries to his upper extremities, back, neck, and spine, and for internal injuries. Dubuc's claim sought compensation from his Employer and from the Second Injury Fund. Dubuc settled his claim with the Employer on February 1, 2017, for a lump sum of $50,000 that represented 30 percent permanent partial disability of the left wrist and 13.5 percent of the body as a whole. Dubuc's claim against the Second Injury Fund was heard by an Administrative Law Judge ("ALJ") on June 26, 2018.

Dubuc and the Second Injury Fund stipulated that the issue to be resolved in the hearing "is the liability of the Second Injury Fund for permanent total disability . . . benefits including the nature and the extent of the permanent disability sustained as the result of [the] injury of October 30, 2015." Dubuc and the Second Injury Fund also stipulated that Dubuc's claim against the Employer was settled as outlined above, though the parties did not agree that the settlement represented the extent of Dubuc's permanent disability resulting from the October 30, 2015 accident.

During the hearing, Dubuc testified and the ALJ received exhibits. Dubuc testified that he continued to experience tingling and numbness in his left hand, particularly in his thumb and in the two fingers closest to his thumb. Dubuc testified that the tingling and numbness in his hand affected his grip so that he can no longer grip tools or carry heavy

3

items, as required for his work running fiber optic lines. The parties stipulated that the date of Dubuc's maximum medical improvement was May 20, 2016.

Dubuc additionally testified about four preexisting disabilities: (1) in April 2010, Dubuc sustained fractures to his L2 and L3 vertebrae after falling off a wall while fishing, and has suffered pain in his back since that time, with the pain being made worse after the October 30, 2015 accident; (2) in August 2011, Dubuc was diagnosed with deep vein thrombosis; (3) in August 2011, Dubuc was diagnosed with Factor V Leiden, a genetic mutation that causes excess blood clotting; and (4) in 2012, Dubuc was diagnosed with and treated for depression. In addition, exhibits received in evidence established that Dubuc dislocated his shoulder when he fell off a wall in 2010; had five bilateral inguinal hernias repaired between 1983 and 1996; and suffered from chronic neck pain for many years.

Other exhibits received during the hearing included a report from Dr. Mitchell C. Mullins ("Dr. Mullins"), the doctor retained by Dubuc's attorney to conduct a medical evaluation of Dubuc. Dr. Mullins conducted a physical examination of Dubuc and reviewed Dubuc's medical records on June 28, 2016, and issued his report the same day ("Dr. Mullins's initial report" or "his initial report"). Dr. Mullins's initial report concluded that Dubuc had limitations on his ability to work, including restrictions on his abilities to lift weight, to stand and walk, to sit for long periods of time, to push or pull, to climb, and to use his hands. Dr. Mullins's initial report concluded that Dubuc has: (1) "a 12% permanent partial disability to the body as a whole rated at the lumbar spine due to injury"; (2) "a 36% permanent partial disability rated at the left wrist due to injury," a rating that "consider[ed] the posterior traumatic arthritis which is apparent in the wrist, loss of range

4

of motion as well as the development of posttraumatic carpal tunnel syndrome"; (3) "a 5% permanent partial disability rated at the left elbow due to lateral epicondylitis"; and (4) "a 6% permanent partial disability rated to the body as a whole due to the kidney laceration," a rating that "consider[ed] post[-]injury scarring and possible long-term effects on the renal function." Dr. Mullins's initial report did not address Dubuc's preexisting disabilities or whether Dubuc was permanently and totally disabled.

After receiving additional medical records from Dubuc, Dr. Mullins issued an addendum on September 1, 2016, to address Dubuc's preexisting disabilities ("Dr. Mullin's addendum" or "his addendum"). Dr. Mullins's addendum concluded that Dubuc has: (1) "a 10% permanent partial disability to the body as a whole rated at the thoracolumbar spine due to prior compression fractures at T12 and L2"; (2) "a 18% permanent partial disability rated at the right shoulder due to prior dislocation"; (3) "a 23% permanent partial disability rated at the abdomen/body as a whole due to recurrent bilateral inguinal hernias"; (4) "a 25% permanent partial disability to the body as a whole due to the [F]actor V Leiden deficiency and chronic anticoagulation," a "rating [that] consider[ed] the ongoing need for anticoagulation, burden of treatment, and the risks and side effects associated with chronic anticoagulation"; (5) "a 9% permanent partial disability to the body as a whole due to depression," a "rating [that] consider[ed] the recurrent treatment since the mid-90s required with the recurrence of symptoms off medication"; and (6) "an 8% permanent partial disability to the body as a whole rated at the cervical spine due to acquired spinal stenosis, and degenerative disc disease." Dr. Mullins's addendum concluded that: "In light of the multiple pre-existing injuries as well as the significant trauma on October 30, 2015, it is

5

my opinion the patient is permanently and totally disabled as a result of this combination." However, Dr. Mullins testified in a deposition taken a few months after he issued his addendum that the work restrictions outlined in his initial report rendered Dubuc permanently and totally disabled as a result of the October 30, 2015 accident.

Dubuc also admitted into evidence the deposition of Dr. David Ross Strauser ("Dr. Strauser"), a vocational expert who evaluated Dubuc. Dr. Strauser testified that, based on Dubuc's injuries and the restrictions associated with those injuries, "there would be no jobs available in the current economy that Mr. Dubuc would be able to maintain on a regular basis." Dr. Strauser testified that he believed Dubuc to be "permanently and totally disabled from a vocational perspective." Dr. Strauser clarified that his opinion about employability was based on "the multiple preexisting injuries as well as the significant trauma [Dubuc suffered] on October 30th, 2015." However, when Dr. Strauser was pressed to consider only those injuries set forth in Dr. Mullins's initial report, Dr. Strauser testified that his "overall opinion would remain unchanged" in that he still believed that "[Dubuc] would have extensive difficulty in meeting the demands of jobs that are currently available in the labor market."

The ALJ issued its award on August 31, 2018 ("ALJ Award"). The ALJ Award identified the applicable law as section 287.220.2, and concluded that Dubuc "failed to sustain his burden of proof that he is permanently and totally disabled as a result of his October 30, 2015 accident and injuries combined with his preexisting disabilities." While the ALJ Award acknowledged that Dr. Mullins and Dr. Strauser opined that Dubuc was permanently and totally disabled when considering the injuries he sustained from the

6

October 30, 2015 accident in combination with his preexisting disabilities, the ALJ Award ultimately relied on Dr. Mullins's and Dr. Strauser's conclusions that the injuries Dubuc suffered in the October 30, 2015 accident were alone sufficient to render Dubuc permanently and totally disabled.

Dubuc appealed the ALJ Award to the Commission. The Commission reversed the ALJ Award, and issued its final award on April 17, 2019 ("Final Award").[3] The Final Award identified the applicable law as section 287.220. Though the Final Award did not reference a subsection, the Final Award quoted section 287.220.2 when it noted that compensation shall be paid from the Fund in "all cases of permanent disability where there has been previous disability."

The Final Award concluded that Dubuc's prior injuries did not prevent him from working prior to October 30, 2015, but that the prior injuries "clearly had the potential to combine with a work-related injury in the future to cause a greater degree of disability than would have resulted in the absence of the condition."[4] Thus, the Final Award concluded that, "[f]or the purposes of Second Injury Fund liability, [Dubuc's] preexisting disabilities therefore constituted a hindrance or obstacle to employment or reemployment." The Final Award concluded that the Second Injury Fund is liable to Dubuc for the rate differential between permanent total disability benefits and permanent partial disability benefits from

---

[3]The Final Award was a 2-1 decision. The dissenting member of the Commission concluded that Dubuc's permanent total disability was attributable solely to the October 30, 2015 injury.

[4]This standard for determining Fund liability is found in section 287.220.2, which, in pertinent part, uses the phrase "caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself."

7

October 30, 2015, for 104.5 weeks, and thereafter for weekly permanent total disability benefits in the amount of $879.03.

The Second Injury Fund filed this timely appeal.

**Standard of Review**

Section 287.490.1 controls our review of the Final Award:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

While we defer to the Commission's factual findings, "'we review issues of law, including the Commission's interpretation and application of the law, *de novo*.'" *Nivens v. Interstate Brands Corp.*, 585 S.W.3d 825, 831 (Mo. App. W.D. 2019) (quoting *Lawrence v. Treasurer of State-Custodian of Second Injury Fund*, 470 S.W.3d 6, 12 (Mo. App. W.D. 2015)).

**Analysis**

The Second Injury Fund argues that the Commission erroneously interpreted and applied the law when it awarded permanent total disability benefits to Dubuc. The Fund argues that because Dubuc's October 30, 2015 work injury occurred after January 1, 2014, section 287.220.3 applied to determine the Fund's liability, not section 287.220.2, and that

8

under section 287.220.3, Dubuc was not entitled to compensation from the Fund for permanent total disability.

Section 287.220 establishes the Second Injury Fund. The General Assembly created the Second Injury Fund in an effort "to encourage the employment of individuals who are already disabled from a preexisting injury, regardless of the type or cause of that injury." *Treasurer of State-Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013) (quoting *Pierson v. Treasurer of State*, 126 S.W.3d 386, 389-90 (Mo. banc 2004)). The existence of the Fund ensures that "an employer is only liable for the disability caused by the work injury." *Id.* The Fund's liability for permanent partial and total disability claims is statutorily limited, however, to the parameters described in section 287.220.

The General Assembly amended section 287.220 effective January 1, 2014. The amended statute now provides, in relevant part:

> 2. All cases of permanent disability where there has been previous disability due to injuries occurring prior to January 1, 2014, shall be compensated as provided in this subsection. . . .

> 3. (1) All claims against the second injury fund for injuries occurring after January 1, 2014 . . . shall be compensated as provided in this subsection. . . .

Section 287.220.2-.3. The standards for determining the Fund's liability for permanent partial and permanent total disability benefits vary depending on which subsection applies.

It is uncontested that the Commission relied on section 287.220.2 to award permanent total disability benefits to Dubuc. The Fund does not challenge that Dubuc is permanently and totally disabled. The Fund argues, however, that the Commission

9

committed legal error when it applied section 287.220.2, instead of section 287.220.3, to determine the Fund's liability to Dubuc. The Fund relies on *Cosby v. Treasurer of State of Missouri as Custodian for Second Injury Fund*, 579 S.W.3d 202 (Mo. banc 2019), which was decided on June 25, 2019, approximately two months after the Final Award.

In *Cosby*, an employee sought an award of permanent disability benefits from the Second Injury Fund after injuring his left knee at work on January 22, 2014. *Id.* at 205. The employee testified about four preexisting disabilities sustained in 1974, 2002, 2004, and 2008. *Id.* The ALJ concluded that, because the employee's work injury occurred after January 1, 2014, section 287.220.3 applied to determine the Fund's liability. *Id.* The ALJ then concluded that the employee was not entitled to permanent total disability benefits from the Fund because the employee continued to work following his 2014 work injury. *Id.* The ALJ also concluded that the employee was not entitled to permanent partial disability benefits from the Fund pursuant to section 287.220.3(2).[5] *Id.* The employee appealed to the Commission, which affirmed the ALJ's award.[6] *Id.*

On appeal, the employee did not contest the denial of his claim for permanent total disability benefits, but did challenge the denial of his claim for permanent partial disability benefits. The employee argued that he was entitled to permanent partial disability benefits from the Fund because section 287.220.2, and not section 287.220.3, controlled this

_____

[5]Section 287.220.3(2) provides, in pertinent part, that "[n]o claims for permanent partial disability occurring after January 1, 2014, shall be filed against the second injury fund."

[6]In other words, the Commission agreed with the ALJ that section 287.220.3 applied to determine the Fund's liability to Cosby for permanent disability benefits. We discuss, *infra* note 8, the likely explanation for the Commission's inconsistent decision to apply section 287.220.2 to determine the Fund's liability to Dubuc for permanent disability benefits.

10

determination. *Id.* at 206. The employee argued that the phrase "previous disability due to injuries occurring prior to January 1, 2014," in section 287.220.2 refers only to the preexisting disabilities relied on to assert a claim against the Fund, and not to the subsequent compensable workplace injury. *Id.* Since his preexisting disabilities occurred before January 1, 2014, the employee argued that section 287.220.2 controlled his eligibility for permanent disability benefits from the Fund. *Id.*

The Supreme Court rejected the employee's urged construction of section 287.220.2, noting that it "overlooks both that the term 'injury' is defined by statute for purposes of workers' compensation and that the plain and ordinary language of section 287.220.3 precludes his interpretation of section 287.220.2." *Id.* at 206-07. The Supreme Court noted that "[s]ection 287.220.3(1) applies to '[a]ll claims against the second injury fund for *injuries* occurring after January 1, 2014.'" *Id.* at 207. The Court observed that "[s]ection 287.020.3(1) defines 'injury' to mean 'an injury which has arisen out of and in the course of employment.'" *Id.* The Court thus concluded:

> When read in the context of section 287.220 as a whole, section 287.220.2 must be interpreted to *apply to all cases of permanent disability* in which *all injuries, including the subsequent compensable injury, occurred prior to January 1, 2014*. In other words, section 287.220.2 applies to *all* [permanent total disability] or [permanent partial disability] claims against the fund for injuries arising out of or in the course of employment when the injury causing [permanent partial disability] and the subsequent compensable injury *all* occurred prior to January 1, 2014. Section 287.220.3 applies to *all* [permanent total disability] or [permanent partial disability] claims against the fund in which *any injury arising out of or in the course of employment, including the subsequent compensable injury, occurred after January 1, 2014*.

*Id.* (emphasis added).

11

The Court reinforced its construction of sections 287.220.2 and .3 by noting that the employee's urged construction of section 287.220.2 would create an inconsistency with the plain and ordinary language of section 287.220.3(2), which provides that "[n]o claims for permanent partial disability occurring after January 1, 2014, shall be filed against the second injury fund." *Id.* The Court observed that this "section does not differentiate between claims in which there has been previous disability prior to January 1, 2014, and claims in which the previous disability occurred after January 1, 2014." *Id.* The Court thus concluded that because the employee's compensable workplace injury occurred after January 1, 2014, section 287.220.3 applied, and that the Commission did not err by applying this subsection to deny the employee's claim for permanent partial disability benefits. *Id.* at 208.

*Cosby* is controlling. Dubuc fell off a ladder and sustained injuries to his left wrist and arm, low back, and kidney on October 30, 2015. Because this compensable workplace injury occurred after January 1, 2014, section 287.220.3 should have been applied by the Commission instead of section 287.220.2 to determine the Fund's liability to Dubuc for permanent total disability benefits.

Dubuc argues that *Cosby* is not controlling because *Cosby's* application is limited to claims against the Fund for permanent *partial* disability benefits.[7] Dubuc argues that

---

[7]The Missouri Association of Trial Attorneys ("MATA") filed an *amicus curiae* brief asserting the same argument. MATA's amicus brief also argues that application of section 287.220.3 to Dubuc's claim against the Fund is inconsistent with the purpose of the Fund to encourage employment of workers with preexisting disabilities. This policy argument disregards that *Cosby* construed section 287.220 as it was written. It is within the province of the General Assembly, not the courts, to determine how best to effectuate public policy. *State ex rel. Koster v. Cowin*, 390 S.W.3d 239, 245 (Mo. App. W.D. 2013). Moreover, *Cosby* rejected the same policy argument, observing that "at the time section 287.220 was amended, the fund was insolvent. Under such circumstances, the legislature justifiably sought to limit the number of workers eligible for fund benefits." 579 S.W.3d at 209-10.

this court's holding in *Gattenby v. Treasurer of State of Missouri-Custodian of Second Injury Fund*, 516 S.W.3d 859 (Mo. App. W.D. 2017), is controlling when a claim is made against the Fund for permanent *total* disability benefits.[8]  We disagree.

*Gattenby* involved a claim for permanent total disability benefits, where a knee injury was sustained in March 2014, and preexisting disabilities were suffered in 2007, 2009, and 2010.  *Id.* at 860.  *Gattenby* concluded that the phrase "previous disability due to injuries occurring prior to January 1, 2014," in section 287.220.2 refers to preexisting injuries that resulted in disability prior to January 1, 2014, regardless when the subsequent compensable workplace injury occurred.  *Id.* at 862.  *Gattenby* held that the omission of any reference to "previous disability" in section 287.220.3(1) indicated an intent to apply section 287.220.3 only when **all** injuries (the preexisting injuries and the subsequent compensable workplace injury) occurred after January 1, 2014.  *Id.*  *Gattenby* thus held that "section 287.220.3 applies only where **both** the preexisting and the primary injuries occur after January 1, 2014."  *Id.* (emphasis added).

*Gattenby* and *Cosby* both construed the phrase "previous disability due to injuries occurring prior to January 1, 2014," in section 287.220.2.  Notably, *Gattenby's* construction of that phrase was the same as the employee's urged (and rejected) construction in *Cosby*. *Gattenby* concluded that **all** injuries (preexisting and the subsequent compensable workplace injury) must occur after January 1, 2014, for section 287.220.3 to apply.  *Cosby*

---

[8]The Commission's Final Award relied on section 287.220.2 to determine whether Dubuc was entitled to permanent total disability benefits from the Fund, though the Commission's final award in *Cosby* relied on section 287.220.3 to determine Cosby's entitlement to both permanent total and permanent partial disability benefits from the Fund.  We assume the explanation for this discrepancy is *Gattenby,* which was apparently decided in the intervening period between the Commission's final award involving Cosby and its Final Award involving Dubuc.

13

concluded that if ***any*** workplace injury (preexisting or the subsequent compensable workplace injury) occurred after January 1, 2014, then section 287.220.3 must apply. *Gattenby* and *Cosby* reached diametrically opposed conclusions regarding the intended meaning of sections 287.220.2 and .3, and cannot be reconciled. Consistent with this fact, *Cosby* abrogated *Gattenby*:

> Mr. Cosby relies on *Gattenby v. Treasurer of Missouri–Custodian of the Second Injury Fund*, 516 S.W.3d 859, 862 (Mo. App. 2017), for the proposition that section 287.220.3 "applies only where both the preexisting and primary injuries occur after January 1, 2014." In *Gattenby*, however, the court of appeals failed to acknowledge that the workers' compensation statute defines the term "injury" and that the plain and ordinary language of section 287.220.3 disallows PPD benefits to employees whose previous or subsequent compensable injuries occurred after January 1, 2014. Accordingly, *Gattenby* should no longer be followed to the extent it is inconsistent with this opinion.

*Cosby*, 579 S.W.3d at 208 n.5.

Dubuc acknowledges that *Cosby* abrogated *Gattenby*, but persists in arguing that *Gattenby* was abrogated only with respect to claims against the Fund for permanent partial disability benefits. We disagree. *Gattenby* did not involve a claim for permanent partial disability benefits and only involved a claim for permanent total disability benefits. *Cosby* was the reverse. If this distinction mattered, it would have been unnecessary for *Cosby* to abrogate *Gattenby*. Instead, *Cosby* recognized that *Gattenby*'s construction of sections 287.220.2 and .3 applied to ***all*** permanent disability claims against the Fund. Similarly, *Cosby*'s construction of sections 287.220.2 and .3 applied to all permanent disability claims against the Fund. *Cosby*'s construction of sections 287.220.2 and .3 did not depend on the type of permanent disability claim involved, and instead turned on the statutory definition

14

of "injury." 579 S.W.3d at 206-07. Though *Cosby* discussed section 287.220.3(2), which prohibits all "claims [against the Fund] for permanent partial disability occurring after January 1, 2014", it did so to reinforce its construction of sections 287.220.2 and .3, and not because the Court intended its construction of the statutes to be limited in application to permanent partial disability claims.

There is no reasoned basis for interpreting sections 287.220.2 and .3 differently based on whether the claim asserted against the Fund is for permanent partial or permanent total disability benefits. Sections 287.220.2 and .3 describe the parameters of the Fund's liability for both types of permanent disability claims. *See* section 287.220.2; section 287.220.3(2). And in some cases, permanent partial and permanent total disability claims are simultaneously asserted against the Fund. *See, e.g.*, *Cosby*, 579 S.W.3d at 204 (noting that the ALJ determined Cosby was not entitled to permanent partial disability or permanent total disability benefits from the Fund). More to the point, *Cosby* has resolved this issue. *Cosby* held that "section 287.220.2 ***must*** be interpreted to apply to ***all cases of permanent disability*** in which ***all injuries***, including the subsequent compensable injury occurred prior to January 1, 2014," and "section 287.220.3 applies to ***all [permanent total disability] or [permanent partial disability] claims*** against the fund in which ***any injury*** arising out of or in the course of employment, including the subsequent compensable injury, occurred ***after*** January 1, 2014." 579 S.W.3d at 207 (emphasis added). We therefore reject Dubuc's contention that *Gattenby* controls instead of *Cosby* with respect to

claims against the Fund for permanent total disability.[9] *See Boland v. Saint. Luke's Health Sys.*, 588 S.W.3d 879, 884(Mo. banc 2019) ("It is well settled that, unless '[t]he rulings made, and the legal conclusions reached, by this [C]ourt,' have been 'criticized, modified, or overruled by this [C]ourt[,]' such rulings are controlling in all lower courts. (emphasis omitted) (quoting *State ex rel. Maclay v. Cox*, 10 S.W.2d 940, 946 (Mo. 1928))).

Undeterred, Dubuc argues that *Cosby*'s legal holding was *obiter dicta* to the extent it addressed permanent total disability claims. We disagree. "Obiter dicta, by definition, is a 'gratuitous opinion.'" *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 59 (Mo. banc 2002) (quoting *Muench v. S. Side Nat'l Bank*, 251 S.W.2d 1, 6 (Mo. 1952)). "[S]tatements . . . are obiter dicta [if] they [are] not essential to the court's decision of the issue before it." *Id.* (quoting *Campbell v. Labor & Indus. Relations Comm'n*, 907 S.W.2d 246, 251 (Mo. App. W.D. 1995)). *Cosby* required the Court to determine the meaning of sections 287.220.2 and .3. *Cosby*'s resolution of this question of law was necessarily applicable, therefore, to the subject of both subsections--the Fund's liability for ***all*** permanent disability claims. *Cosby*'s expression of this obvious point is not *obiter dicta* merely because the broad legal standard announced was then applied by the Court to a narrower set of facts. *See, e.g.*, *Richardson*, 81 S.W.3d at 59 (holding that court's announcement of a legal

---

[9]In his brief, Dubuc suggests that the Eastern District agrees that section 287.220.2 applies if ***any*** preexisting disability or compensable workplace injury occurs before January 1, 2014, and that section 287.220.3 applies ***only if all*** preexisting disabilities and the compensable workplace injury occur after January 1, 2014, relying on *Krysl v. Treasurer of Missouri as Custodian of Second Injury Fund*, No. ED107591, 2019 WL 4780359 (Mo. App. E.D. Oct. 1, 2019). *Krysl* did not so hold. In *Krysl*, "[a]ll parties unequivocally stipulated [that] Krysl's occupational disease occurred on or about January 1, 2013. Thus, based upon the plain language of Section 287.220, the Fund's liability . . . should be governed by Section 287.220.2." *Id*. at *3. This is precisely the outcome that *Cosby* dictates. *Krysl* is of no import to this case, as none of the medical conditions or workplace injuries relied on to assert a claim against the Fund occurred after January 1, 2014.

standard was not *obiter dicta* merely because the standard is broader in scope than the narrower set of particular facts before the court).

Finally, Dubuc argues that *Cosby* relied on the definition of "injury" found at section 287.020.3(1), when it should have relied on the definition of "injury" found at section 287.020.3(5). Dubuc argues that reliance on the definition of "injury" in section 287.020.3(5) would have altered the outcome in *Cosby*. The premise of Dubuc's argument is flawed.[10]

Section 287.020.3(1) and section 287.020.3(5) are not incongruent and instead work in harmony. Section 287.020.3(1) provides that "the term 'injury' is hereby defined to be *an injury* which has arisen out of an in the course of employment." (Emphasis added.) Section 287.020.3(5) provides that the term "'injury' . . . shall mean violence to the physical structure of the body and to the personal property which is used to make up the physical structure of the body . . . ." Read together, "injury" as defined in section 287.020.3(1) means "[violence to the physical structure of the body and to the personal property which is used to make up the physical structure of the body] which has arisen out of and in the course of employment." *Cosby* correctly concluded, therefore, that the term "injury" as used in sections 287.220.2 and .3 refers to injuries arising out of and in the course of employment.

In light of the foregoing discussion, we conclude that the Commission erroneously declared and applied the law when it relied on section 287.220.2 to determine that Dubuc

---

[10] Dubuc's assertion would constitute an improvident challenge to Supreme Court precedent we are duty bound to follow. *See Boland*, 588 S.W.3d at 885.

was entitled to an award for permanent total disability benefits from the Fund. Instead, section 287.220.3 controlled this determination.

The Second Injury Fund argues that we need not remand this matter to the Commission to apply the proper legal standard to the evidence, and that we can instead apply the correct law and modify the Final Award. It is true that following our review of questions of law, section 287.490.1 authorizes this court to modify, reverse, remand for rehearing, or set aside an award. However, for reasons we explain, we do not believe it appropriate to exercise our authority to modify the Final Award in this case.

Section 287.220.3(2) addresses when a claim for permanent total disability against the Second Injury Fund will be compensable. A claimant must establish that:

> (a) a. [The claimant] has a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:
>
> (i) A direct result of active military duty in any branch of the United States Armed Forces; or
>
> (ii) A direct result of a compensable injury as defined in section 287.020; or
>
> (iii) Not a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury; or
>
> (iv) A preexisting permanent partial disability of an extremity, loss of eyesight in one eye, or loss of hearing in one ear, when there is a subsequent compensable work-related injury as set forth in subparagraph b of the opposite extremity, loss of eyesight in the other eye, or loss of hearing in the other ear; and
>
> b. Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in

items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter; or

(b) An employee is employed in a sheltered workshop as established in sections 205.968 to 205.972 or sections 178.900 to 178.960 and such employee thereafter sustains a compensable work-related injury that, when combined with the preexisting disability, results in permanent total disability as defined under this chapter.

Section 287.220.3(2)(a)-(b).

The Second Injury Fund alleges that Dubuc's evidence failed to establish these requirements in that: (1) while Dr. Mullins opined that Dubuc had two qualifying preexisting disabilities equaling at least fifty weeks of permanent partial disability (his hernias rated at 23 percent body as a whole and his blood condition rated at 25 percent body as a whole),[11] there was no evidence that these disabilities were medically documented before the October 30, 2015 work injury; (2) even assuming there was evidence that these qualifying preexisting disabilities were medically documented, there was no evidence that these disabilities were a result of active military duty or of a compensable injury as defined in section 287.020, or that these qualifying preexisting disabilities directly and significantly aggravated or accelerated the subsequent compensable workplace injury which occurred on October 30, 2015.

We agree with the Fund that no evidence in the record permits the conclusion that Dubuc's potentially qualifying preexisting injuries (the hernias and blood condition) were a result of active military duty or a direct result of a compensable injury as defined in

---

[11]Dubuc's Brief reflects his agreement that the only preexisting disabilities described in the evidence that could qualify as preexisting disabilities under section 287.220.3 are his hernia condition and his blood condition. Both parties' Briefs state that Dr. Mullins's rating of the hernia condition would equate to 92 weeks, and that Dr. Mullins's rating of the blood condition would equate to 100 weeks.

19

section 287.020. As a result, in order for Dubuc to secure an award for permanent total disability benefits from the Fund, the evidence in the record must establish that these preexisting disabilities were medically documented before his workplace injury on October 30, 2015; that one or both of the these preexisting disabilities "directly and significantly aggravate[d] or accelerate[d] the subsequent work-related injury [on October 30, 2015];" and that these preexisting disabilities were not "unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury [on October 30, 2015]." Section 287.220.3(2)(a)a(iii).

The Commission generally found, without reference to specific disabilities, that all of Dubuc's preexisting disabilities described in the evidence "clearly had the potential to combine with a work-related injury in the future to cause a greater degree of disability than would have resulted in the absence of the condition." And the Commission found that "based on Dr. Mullins'[s] and Dr. Strauser's expert opinions, . . . [Dubuc's] undisputed permanent and total disability is attributable to a combination of industrially disabling preexisting conditions in combination with disability from the primary injury." As we have explained, these findings erroneously applied the standard for determining Fund liability described in section 287.220.2. As a result, the Commission's findings did not address which (if any) of Dubuc's preexisting disabilities were medically documented preexisting disabilities equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation. Section 287.220.3(2)(a)a. And the Commission did not address whether Dubuc's qualifying preexisting disabilities (if any) "directly and significantly aggravate[d]

20

and accelerate[d] the subsequent work-related injury" Dubuc suffered on October 30, 2015, a more strident standard of eligibility than the standard described in section 287.220.2. Section 287.220.3(2)(a)a(iii). Finally, the Commission did not consider whether Dubuc's qualifying preexisting disabilities (if any) were "unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury [on October 30, 2015]." *Id.*

These determinations will require the Commission to consider all of the evidence and to make additional factual findings before applying the correct legal standard to the facts. Our standard of review does not permit us to make factual findings. *See Nivens*, 585 S.W.3d at 831. As such, modification of the Final Award is not appropriate. Instead, we reverse the Final Award and remand this matter to the Commission to properly apply the law to the evidence.

The Second Injury Fund's point on appeal is granted.

## Conclusion

The Commission's Final Award is reversed. This matter is remanded to the Commission with instructions to apply the proper legal standards described in section 287.220.3 to the evidence to determine whether Dubuc has sustained his burden to establish the right to an award of permanent total disability benefits from the Fund.

_____
Cynthia L. Martin, Judge

All concur

21